# Commonwealth, Appellant, v. Vrooman.

[Marked to be reported.]

*Insurance—Regulation of contract—State supervision—Privilege of citizens—Constitutional law—Police power.*

The business of insurance against loss by fire is, by reason of its magnitude, its importance to property owners, and the nature of the business, a proper subject for the exercise of the police power of the state.

The act of Feb. 4, 1870, P. L. 14, which prohibits any person, partnership or association from issuing any policy or making a contract of indemnity against loss by fire, without authority expressly conferred by a charter of incorporation, is a valid exercise of the police power.

The act does not prohibit but merely regulates the business of insurance. It excludes no one from engaging in it, but prescribes the preliminary qualification necessary for all alike, to entitle them to enter the business. It is open to all under general laws, is not burdensome, and its only effect is to secure adequate capital, at the beginning, and state supervision during the continuance of the business.

As the act of Feb. 4, 1870, does not strike at any privilege of citizenship of the United States as distinguished from the privileges of citizenship of Pennsylvania, and, as it does not attempt to draw a line between citizens of Pennsylvania and citizens of other states, it does not violate the 14th amendment of the constitution of the United States.

As the act of February 4, 1870, does not deny, but merely regulates the right to acquire, possess, and protect private property, it does not violate § 1 of the bill of rights of the constitution of Pennsylvania.

*Presumption in favor of constitutionality of act.*

The legal presumption is in favor of the constitutionality of an act, because the act expresses the judgment of the legislative branch of the government upon the question with which it deals.

Argued May 31, 1894. Appeal, No. 90, July T., 1894, by plaintiff, from judgment of Q. S. Phila. Co., March T., 1894, No. 358, for defendant on a special verdict. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Indictment for issuing a policy of insurance in violation of act of Feb. 4, 1870, P. L. 14.

The jury returned the following special verdict.

"And now, to wit, March 20, 1894, the jury impaneled and duly sworn to try the issue joined in above case between the Commonwealth of Pennsylvania and Samuel B. Vrooman, the

defendant, find the following facts and present the same as a special verdict in the case :

" The defendant, acting for himself and as attorney in fact for J. K. Cuming, R. H. Foerderer, B. J. Woodward, C. A. Furbush and J. Gibson McIlvain, did sign and issue on March 12, 1894, a certain policy of insurance and contract of guaranty against loss by fire in the sum of one thousand dollars on the household furniture of James G. Kimball, located and being in the county of Philadelphia and state of Pennsylvania, without authority expressly conferred by a charter of incorporation given according to law."

Judgment was entered for defendant on the special verdict, in the following opinion by BIDDLE, J.:

" The act of February 4, 1870, P. L. 14, entitled ' An act to prevent the issue of unauthorized policies of insurance,' provides as follows :

" ' Section 1. That it shall be unlawful for any person, partnership or association, to issue, sign, seal, or in any manner execute any policy of insurance, contract or guaranty, against loss by fire or lightning, without authority expressly conferred by a charter of incorporation, given according to law; and every such policy, contract or guaranty, hereafter made, executed or issued, shall be void.

" ' Section 2. That any person offending against the provisions of this act, or any person who shall make, execute or issue any policy of insurance, contract or guaranty, against loss by fire or lightning, without being so authorized by law, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall pay a fine, not exceeding two hundred dollars, to the commonwealth, and the costs of prosecution ; one half of said fine shall be for the use of the informer : Provided, that nothing herein contained shall apply to any insurance company authorized by the laws of any other state to issue policies and effect insurance against loss by fire or lightning, which shall have complied with the laws of this commonwealth with respect to foreign insurance companies.'

" The question raised here is whether that act is constitutional.

" It is not denied that the legislature has full power to regulate and control this whole subject, and to require, under its

police power, such supervision as will effectually protect the public. But it is contended that they have no right to forbid, under heavy penalties, any person, partnership or association from performing a harmless act, while such power is freely granted to corporations.

" The privilege to insure is undoubtedly of advantage to the community, and is so treated in all our legislation. Originally it was entirely in the hands of individual underwriters, and certainly there is no greater instance of the encroachment of corporate power than this, where they have not only acquired all the rights of persons, partnerships and associations, but have absolutely divested the latter of the power of exercising them. And even foreign corporations are allowed to engage in a business denied to our own citizens. That no citizen can agree to indemnify another against loss by fire, is certainly a most startling proposition. The most odious species of monopoly is where a government grants to a body of men any particular trade or business. If the power exists, the legislature could grant to one corporation the exclusive right to sell dry goods, inflicting penalties upon any one who interfered with it, and thus destroy that free competition which is the life of all healthy trade.

" There can be no doubt that the commonwealth may prohibit every one from engaging in a trade which is deleterious to the community, and it was on this ground that the Slaughter House Cases, 16 Wall. 36, and the Oleomargarine Cases, in Powell v. Penna., 127 U. S. 678, were upheld by the Supreme Court of the United States. The state may also prohibit certain kinds of business by individuals, because the public convenience demands that they should be carried on by agents of the government. The carrying of the mails and the supply of gas and water under the public streets are instances of this. See New Orleans Gas Company v. Louisiana Light Company, 115 U. S. 650; New Orleans Water Works Company v. Rivers, 115 U. S. 674. But the business engaged in must be shown, either by the common law or by appropriate legislation, to be deleterious or from necessity governmental. And we do not think a case can be found in which a state law granting a monopoly or forbidding a business was not founded on some necessity, either moral or governmental.

" In the act in question, there is nothing showing that insurance issued by individuals is in any way directly or indirectly injurious. The very act itself only forbids contracts of indemnity against 'fire and lightning,' while policies of insurance on lives, accidents, by way of guaranty, marine, against storms, tornadoes and explosions, are left free to every one, so that it must be something prejudicial to the community, in individuals entering into contracts against loss by fire and lightning as opposed to other contracts of insurance. What that can be, it is difficult to imagine. If carried to its legitimate result, it would probably prevent a citizen from erecting a lightning rod for a neighbor, as being a guaranty against loss from lightning.

" In Dent v. West Va., 129 U. S. 114, Justice FIELD says : 'It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may, in many respects, be considered as a distinguishing feature of our republican institutions. Here, all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study, and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be taken from them any more than their real or personal property can be thus taken.'

" It would seem, therefore, that this law is obnoxious to the fourteenth amendment of the constitution of the United States, ' that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States nor deny to any person within its jurisdiction the equal protection of the laws.' It also, we think, comes under the ban of our own constitution. The first section of the first article of the bill of rights declares ' that all men are born equally free and independent, and have certain inherent and inalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation and pursuing their own happiness.'

" In Illinois (see Frorer v. People, 141 Ill. 171), the act de-

claring that ' it shall be unlawful for any person, company, corporation or association now engaged, or hereafter to be engaged in any mining or manufacturing business in this state to engage in or be interested, directly or indirectly, in keeping a truck store or in controlling any store, shop or team for the furnishing supplies, tools, clothing, provisions or groceries, to his, its or their employees while so engaged in mining or manufacturing,' and imposing a penalty for the violation of the act, without placing similar restrictions on employers engaged in other kinds of business, was held unconstitutional as ' depriving persons of property without due process of law,' the court saying ' it is impossible under that power (the police power) that what is lawful if done by A, if done by B can be a misdemeanor, the circumstances and conditions being the same.'   In Godcharles & Co. v. Wigeman, 113 Pa. 431, the act of June 29, 1881, commonly known as the ' Store Order Act,' P. L. 147, was denounced by our Supreme Court as ' an attempt by the legislature to do what in this country cannot be done, that is, to prevent persons who are sui juris from making their own contracts.

" The insurance against loss by fire is a mere contract of indemnity, and the legislature has no right, we think, to deprive or restrain a citizen from obtaining it from persons, partnerships or associations, and to compel him to secure it alone from an artificial body, the members of which are not personally liable for its obligations.   Neither have they the right to make it a crime in him to sign a bond of indemnity for the protection of his neighbor if they allow it to be done by a corporation.

" We have not attempted to make an exhaustive examination of this subject, but have desired, in giving judgment for the defendant in this case, to indicate the line of thought which has induced us to do so."

*Errors assigned* were, (1) in holding that the act of Feb. 4, 1870, P. L. 14, entitled " An act to prevent the issue of unauthorized policies of insurance," is unconstitutional ; (2) in holding that act obnoxious to the 14th amendment of the constitution of the United States, and therefore void ; (3) in entering judgment for defendant ; (4) in not entering judgment for the commonwealth and sentencing defendant.

*W. U. Hensel,* attorney general, *George S. Graham,* district attorney, and *James A. Stranahan,* deputy attorney general, with him, for appellant.—The act of 1870 made the business of insurance in Pennsylvania a franchise. While, at common law, the right to insure was regarded as a private and personal right and might be exercised by any one, it is at all times within the power of the sovereign state to declare that this or any other business shall be a franchise, open, of course, to all its citizens.

The ultimate right of declaring what shall and what shall not be deemed a franchise is in the hands of the legislature : California v. R. R., 127 U. S. 40; Attorney General v. Ins. Co., 2 Johns. Ch. 371; Attorney General v. Ins. Co., 15 Johns. 358; 2 Spelling on Ext. Relief, §§ 1806, 1808.

The state derives its support in part from the taxation of the franchise it has created : Act of June 1, 1889, P. L. 433.

It appears, therefore, that the state may, for revenue purposes, lay hold of some particular traffic as a franchise, and though it must grant the exercise of it to all its citizens who may comply with the conditions, on like terms, it may certainly prescribe that before they exercise it they must associate themselves together in a corporate capacity so that persons doing business with them may have the advantages of corporate succession, of equal claim upon the assets of the corporation and of the visitation of the commonwealth.

The case is wholly different from the prohibition by the state of Illinois (Frorer v. People, 141 Ill. 171) of persons mining and manufacturing, from keeping or controlling certain classes of stores. In like manner it differs from Godcharles v. Wigeman, 113 Pa. 437; Com. v. Perry, 155 Mass. 117, and Ramsey v. People, 32 N. E. R. (Ill.) 364. They were all cases in which rights accorded one class of persons were denied to another.

The Supreme Court of Illinois on April 2, 1894, delivered an opinion in Burdic v. People, 36 N. E. R. 948, in which it declared a law of that state to be constitutional forbidding persons from selling railroad and steamboat tickets unless they had certificates of authority from the companies issuing them, and except that the person offering the ticket for sale had bought it from a certified agent with bona fide intention of traveling upon the same. Upon the authority of Davidson v.

New Orleans, 96 U. S. 97, Cooley on Const. Lim., 5th ed., p. 435, and other authorities, the court held that the disposition of property might be limited and regulated when the interests of the public so required.

*John G. Johnson*, for appellee.—The act of 1870 is defective in that its title does not disclose its purpose, viz : to prevent the transaction, by individuals, of a business ordinarily done by them. How is such purpose of exclusion intimated by an announcement of one " to prevent the issue of unauthorized policies of insurance ? " The act is meant not to prevent what is unauthorized but to destroy the authority. The title intimates an intent to prevent what is already without authorization.

Property, within the meaning of the constitution, includes contracts necessary for its enjoyment, protection, use and disposition : Braceville Coal Co. v. People, 35 N. E. R. 62 ; Frorer v. People, (Ill.) 31 N. E. R. 397 ; State v. Coal Co., 36 W. Va. 802 ; Com. v. Perry, 155 Mass. 117 ; Hare, Const. Law, 357 ; People v. Gillson, 109 N. Y. 389.

The act of 1870 is not a valid exercise of the police power of the legislature : 4 Bl. Com. 162 ; Cooley's Const. Lim., 6th ed. 704 ; Mugler v. Kansas, 123 U. S. 661 ; People v. Gillson, 109 N. Y. 389 ; Powell v. Com., 114 Pa. 272 ; Powell v. Pa., 127 U. S. 684 ; Slaughter House Cases, 16 Wall. 62 ; Missouri v. Loomis, 115 Mo. 307 ; Godcharles v. Wigeman, 113 Pa. 437 ; State v. Goodwill, 33 W. Va. 179 ; State v. Coal & Coke Co., 33 W. Va. 188 ; Kuback's Case, 85 Cal. 274 ; Millett v. People, 117 Ill. 294 ; Jacobs's Case, 98 N. Y. 98 ; Com. v. Perry, 155 Mass. 122 ; Ramsey v. People, 32 N. E. 364 ; Frorer v. People, 31 N. E. R. (Ill.) 395.

No protection of public health or morals, and no public purpose, can be furthered by legislative discriminations in the matter of the persons authorized to do certain acts, certainly not where such discriminations do not involve regulations, but an absolute prohibition. If corporations can be permitted to do a business which is forbidden to individuals, why may there not be discriminations between corporations themselves, or even between individuals ?

If it be competent to forbid individuals to transact the busi-

ness of insurance, why is it not also competent for the legislature to forbid them from transacting the business of loaning money, or of manufacturing, or of selling? The constitutional right of every man to use his person and property at his pleasure, provided he does not improperly injure his neighbor, or the commonwealth, could be entirely destroyed by legislative enactments preventing him from the pursuit first of one and then of another avocation, until he would be debarred from all.

Individuals may not engage in the business of constructing and operating railroads or turnpikes, because this involves the exercise of the right of eminent domain. At common law, however, they may manufacture, may sell, and may contract. How can the exercise of the police power justify the legislature in prohibiting them from doing such things?

There is no analogy between the circulation of notes as money and the execution of a contract of insurance. The whole community is affected by the circulation of notes. The contract of insurance is a private one which can only affect the parties thereto.

It is impossible for the commonwealth to save the constitutionality of the act of 1870, by reference to the revenue act of 1889. The state cannot, because it does not see fit to tax insurance business in the hands of individuals, deprive the latter of their right to transact the business.

The business of fire insurance is hardly one "affected by public interest," within the meaning of the Elevator Cases of Munn v. Illinois, 94 U. S. 113; Budd v. N. Y., 143 U. S. 528; People v. Budd, 117 N. Y. 1.

Whilst a business "affected by public interest" may be regulated, it does not follow that it may be prohibited: Prentice on Police Powers, 42; Cooley, Const. Lim., 6th ed. 744.

OPINION BY MR. JUSTICE WILLIAMS, Oct. 1, 1894:

This case raises a question of constitutional law that does not seem to have been decided by the courts of this state. The facts are that in 1870 the legislature passed and the governor approved an act entitled "An act to prevent the issue of unauthorized policies of insurance." Section first made it unlawful for any person, partnership or association, to issue any

policy of insurance against fire without authority to do so expressly conferred by a charter of incorporation given according to law; and declared all policies issued without such authority to be void. The second section made it a misdemeanor to issue a policy of insurance against loss by fire without the authority required by the first section.

The special verdict rendered in this case finds that the defendant did violate the act of 1870 by making and issuing for himself and others a policy against loss by fire in the year 1894, without having obtained a charter of incorporation authorizing the making of such insurance.

Upon this verdict the learned judge of the court below entered a judgment in favor of the defendant, holding that the act of 1870 was void because in violation of the constitution of the United States and of this state. The commonwealth appeals. A single question is thus presented, viz: Does the act of 1870 violate the constitution of either the United States or this state?

The learned judge held that the 14th amendment to the constitution of the United States was infringed by the act of 1870. This amendment declares that " no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor deny to any within its jurisdiction the equal protection of the law." The purpose and effect of this amendment have been discussed and declared by the United States courts in many cases, and' there ought to be no doubt upon the subject at this time. It was aimed at discriminations made or attempted by the laws of any of the states against persons upon whom the laws of the United States conferred the rights and privileges of citizenship. Such discriminations, whether directed against persons of a particular race or color resident within the state, or against persons resident in other states, are forbidden by the 14th amendment. But the proper exercise of the police power by the several states is not within the intent or the letter of the amendment: Powell v. Pennsylvania, 127 U. S. 678. On the other hand its purpose was declared in the Slaughter House Cases, 16 Wall. 36, to be to protect, " against the hostile legislation of the states, the privileges and immunities of citizens of the United States as distinguished from the privileges and immunities of citizens of the states."

The act of 1870 strikes at no privilege of citizenship of the United States as distinguished from the privileges of citizenship of Pennsylvania. It does not attempt to draw a line between citizens of this state and citizens of other states. It is therefore in no sense a violation of the 14th amendment of the constitution of the United States, and this branch of the discussion may be properly dropped at this point, and our attention confined to the other, viz :

Is the act of 1870 a violation of the 1st section of the bill of rights in the constitution of this state ? That section affirms that " All men are born equally free and independent, and have certain inherent and inalienable rights, among which are those of . . . . acquiring, possessing and protecting property and reputation." The methods by which this right to acquire property is asserted and exercised are however, and have been since organized government began among men, subject to regulation by law. The power of government thus brought into service is known as the police power. If the act of 1870 is a valid exercise of the police power then no constitutional right is invaded, but the mode in which the right guaranteed by the 1st section of the bill of rights may be exercised consistently with the best good of the greatest number is regulated and prescribed.

The general character of the police power is well understood, although neither the text books nor decided cases have yet given us an adequate definition of it. Little more has been attempted by the courts of this country than to determine that a particular subject does or does not fall within the range of this power. An illustration is afforded by the Beer Co. v. Massachusetts, 97 U. S. 25, in which this language was used : " However difficult it may be to render a satisfactory definition of it (the police power) there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals." Blackstone in his Commentaries, vol. 4, p. 162, describes this power as the power of " public police and economy," by which the internal regulation and good order of the state is secured, and individual citizens, like the members of a well ordered family, are made to conform their conduct to the rules of propriety, good neighborhood and good manners.

It is therefore a power inherent in all forms of government. Its exercise may be limited by the frame or constitution of a particular government, but its natural limitations, in the absence of a written constitution, are found in the situation and necessities of the state, and these must be judged of in the first instance by the government itself. It corresponds to the right of self-preservation in the individual. When the dangers that threaten the state come from without, the right of self-preservation is exercised in gathering armies and the means of public defence. When the dangers arise within the state, self-preservation requires their suppression. This is accomplished by the exercise of the police power which deals with all forms of disorder, and provides for the public welfare, and the protection of citizens against the violence and the fraudulent conduct of each other.

Now the question whether any particular subject is so related to the public good as to justify the exercise of this power in its control, is one for the determination, in the first instance, of the lawmaking branch of the government. In disposing of it, the legislature is subject to no limitations except such as the constitution of the state may impose. Within the lines set by constitutional provisions, the power of the legislature is practically absolute; but if it is alleged that a given police regulation violates the fundamental law, a question is raised for the determination of the courts, whose duty it is to apply the constitutional tests and adjudge the law to be void if it is in conflict with them. In this case we are to apply the first section of the bill of rights to the act of 1870 in order to determine whether it can be enforced. If the act denies the inherent and inalienable right of the citizen to acquire, possess and protect property, which is asserted by this section of the bill of rights, then the judgment of the court below was right and this appeal should be dismissed; but if this right is not denied, and the effect of the act of 1870 is merely to regulate its exercise, then the judgment should be reversed and the defendant should suffer the penalty of the law he has disregarded.

Before entering upon this question, three preliminary observations should be made: First, we must remember that the legal presumption is in favor of the constitutionality of the act because it expresses the judgment of the legislative branch

of the government upon that question.   The legislature has considered the question and passed upon it and this makes a prima facie case in favor of the law.   We observe in the next place that this question is to be considered upon the state of the law as it is when the question is raised.   Since 1870 the constitution of the state has been remodeled and many of its new provisions have been enforced by suitable legislation.   Our question is not, therefore, whether the act of 1870 was valid under the constitution as it then stood, but whether it was valid when its provisions were invoked against the defendant in 1894.   Our third observation is that the question is not controlled by common law maxims.   The police power must necessarily enlarge its range as business expands and society develops.   The proper office of statutes is to remedy the defects and modify the operation of common law rules to meet changed conditions in society and increased volume and improved methods in business.

We come now to inquire whether the business of insurance against loss by fire is at the present time a proper subject for the exercise of the police power of the state ?   In examining this question it is important to know something about the magnitude of the business.   The report of the insurance commissioner, appointed under the laws of the state, covering the transactions of the year 1892, shows that risks were written in Pennsylvania during that year as follows :

| | |
|---|---:|
| By stock companies of Pennsylvania amounting to | $286,584,023 |
| By stock companies of other states . | 412,489,251 |
| By stock U. S. branches foreign companies . | 248,407,450 |
| By mutual companies of Pennsylvania . | 137,328,820 |
| | $1,084,809,544 |

Making the enormous total of one billion and nearly eighty-five millions of dollars.

The losses paid in the same year, as shown by the same report, amounted to nearly seven and one quarter millions of dollars.   The total capital employed in the business of fire insurance in this state during the year was nearly two hundred sixteen and one half millions of dollars.   The premiums paid by the insured fell a little short of twelve millions of dollars.

Let us consider next the nature of the business.   It is not

like the sale of commodities for a present equivalent in value, but it is the purchase of indemnity against the risk of loss by fire that may happen at any time, and may not happen at all. The conditions necessary to the business of insurance are: (*a*) The existence of a known danger to which all property owners are exposed, and against which they cannot effectually protect themselves; (*b*) the strong probability that loss from this danger will fall upon but few of those who are exposed to it; (*c*) the certainty that when the loss happens it will fall so heavily on those to whom it comes as to make pecuniary indemnity a matter of great importance; (*d*) some knowledge of the relative value of the property annually destroyed by fire to serve as a basis for calculating the risk assumed by the insurer, and the amount of premium required to enable the insurer to meet losses and expenses and secure a fair return for the capital employed.

In view of the magnitude and the nature of the insurance business, it is apparent that the public is largely interested in all that relates to it. The security of policy holders requires, first, permanency in the custodian of the funds gathered from them, and on which their indemnity in case of loss depends; second, an honest and competent administration of these funds; third, restraint against the division of the profits of the business whenever such division would injuriously affect the security of policy holders. How are these safeguards to be obtained? There is but one way in which they can be obtained and that is by means of general laws regulating the insurance business.

Corporations derive their existence from the state, and hold their franchises subject to legislative control. They are subject to the visitorial power of the commonwealth, and they may be, and are, in fact, required to lay open before the several departments of state government, and before the public, the character and extent of their business, the profits realized, the dividends declared, and the investments made. The legality and business value of the methods, the economy and financial strength of the management, and the value of the security provided for the holders of policies in any given company, are therefore subjects upon which the proper state officers may be thoroughly informed, and which the public may investigate at will. Private individuals are not subject to the same visitorial

power.   They cannot ordinarily be compelled to disclose their business methods, their financial condition, or the character of their investments.   They cannot be restricted in the use of either their capital or their profits as corporations may be. Those who deal with them must trust more to their personal integrity than the common experience shows to be safe.   The state can compel a fair measure of fidelity in the management of these vast sums, and provide for the safety of the insured when, and only when, the business is in the hands of corporations.

In the next place it is important to consider what may be described as the trend of modern legislation on this subject. The states of the Union have severally entered upon legislation regulating insurance.   In each an insurance department of the state government has been organized.   A general supervision and control of insurance companies has been assumed by the states, and exercised through the insurance department. In our own state this system of legislation began as early as 1810, and it has grown in bulk and importance with the growth of business and the development of the resources of the state. It fixes the minimum of actual capital necessary to the organization of a corporation for insurance against fire, on the stock plan, at one hundred thousand dollars.   It provides for a reserve fund for the security of policy holders.   It prohibits the division of profits in dividends to the injury of the reserve fund.   It regulates the form of policy and requires the application to be attached to, or made part of, the policy.   It requires each company to submit detailed statements of the business done, of its assets and liabilities, and to show its financial condition.   It requires companies, organized under the laws of other states or countries, to make certain deposits in this state to secure those who are insured by them, and to appoint some suitable agent on whom process may be served in actions brought against them.   These regulations have been made from time to time as their importance has been felt by the public.   They are all easy of enforcement against corporations. Some of them cannot be enforced against private persons or partnerships.   As matter of fact the business has for many years been left to the corporations, and regulations made to affect corporations have therefore met fully the public need.

At this time, however, private capital is seeking employment in this field, and it signalizes its entry upon the field by a denial of the power of the state over it. This question has been raised by the corporations of other states, but I recall no case in which it has been raised by individuals. In Doyle v. The Continental Insurance Company, 94 U. S. 535, the Supreme Court of the United States stated the general rule thus: " A state has the right to impose conditions, not in conflict with the constitution of the United States, on the doing of insurance business within its territory by an insurance company chartered by another state, or to exclude it altogether." It would seem to follow logically that the state might require all persons desiring to enter upon the business to comply with the same conditions and, if necessary, to obtain a charter of incorporation in order to such compliance.

An effort is made to distinguish between regulation and prohibition and to hold that the act of 1870 is a prohibition operating upon all natural persons for the benefit of corporations, who are thus given an oppressive monopoly of the business of insurance against fire. But the prohibition is only such as is necessary to give effect to the regulation which the act prescribes. The act implies a declaration by the legislature that the business of insurance against fire affects so many persons, and involves such large sums of money, as to make it necessary for the public protection that it be subjected to the supervision and control of the government; that the supervision required is such as private persons cannot be compelled to submit their business conduct to; and then expressly declares that all persons desiring to embark in the business must procure a charter of incorporation for that purpose because corporations are subject to the supervision and control of the state that creates them. This is regulative. It directs the business into the only channel that admits the necessary measure of control and it necessarily prohibits the business outside that channel.

The traffic in intoxicating drinks is regulated by law; but the regulation prohibits absolutely all persons from engaging in it unless they have first secured the permission of the state by obtaining a license under the law. Here, as in the act of 1870, we find permission to those who comply with the regulation, and prohibition to those who do not. The practice of

medicine, the sale of drugs, and many other sorts of business are regulated by law ; but the regulation would be without effect if it did not include a prohibition directed against those not qualified, and enforce it with suitable penalties. The police power of a state may be exerted for the complete or the partial control of a given business. It may prohibit it absolutely to all persons for the purpose of suppression. It may permit it to some persons and under certain restrictions in order to secure control over it and hold it within proper bounds: Stone v. Mississippi, 101 U. S. 814. The Sunday laws, the laws against gambling, against lotteries, against disorderly houses, the sale of liquors, the sale of oleomargarine, the sale of drugs, and many similar laws afford instances of the exercise of the police power for the complete suppression of a given line of employment, or for its restriction and control.

The act of 1870 belongs to the latter class. It does not prohibit the business of insurance but regulates it. It says to all persons interested, " If you wish to embark in this business you must secure a charter of incorporation so as to subject your business to the visitorial power of the state. If you will not do this you must not engage in insurance against fire at all." This is not prohibition of the business, for the business is distinctly authorized. It is an effort to bring it under state supervision and control, by requiring all who wish to enter the business to put themselves in a position where the insurance legislation of the state will reach them, and the insurance department of the state can supervise their business, and compel observance of the law.

Without going further into the discussion we may now state our conclusions applicable to the case before us :

First. The business of insurance against loss by fire is, by reason of its magnitude, its importance to property owners, and the nature of the business, a proper subject for the exercise of the police power of the state.

Second. The act of 1870 is a valid exercise of the police power. It does not prohibit but regulates the business. It excludes no one from engaging in it, but prescribes the preliminary qualification necessary for all alike, to entitle them to enter the business.

Third. The qualification is reasonable. It is open to all un-

der general laws.     It is not burdensome.     Its only effect is to secure adequate capital at the beginning, and state supervision during the continuance of the business.

Fourth.     Upon the special verdict, judgment should have been entered in favor of the commonwealth and sentence should have been pronounced under the act of 1870.     That this may now be done, the judgment is reversed, the record remitted, and a procedendo awarded.

DISSENTING OPINION BY MR. JUSTICE DEAN :

The act of February 4, 1870, declares it to be a misdemeanor for any person to issue a policy of insurance against loss by fire or lightning, without authority being expressly conferred so to do, by a charter of incorporation issued according to law.

The defendant, on March 12, 1894, issued a policy to James G. Kimball in the sum of $1,000, indemnifying him against loss by fire on his household furniture contained in his dwelling house in Philadelphia, without authority expressly conferred by an act of incorporation.     For so doing, he was indicted and tried March 20, 1894.     There was no dispute as to the facts, and the jury, in a special verdict, found them as stated.     The court, being of opinion the act was unconstitutional, entered judgment on the verdict for defendant, and thereupon the commonwealth appealed.

Unquestionably, the legislature has the authority to enact any law not in conflict with the constitution of the state or of the United States.     The right to limit the transaction of the business of fire insurance to incorporated associations, is not, in express terms, forbidden.     But the right of natural persons to make contracts of indemnity against loss by fire or shipwreck was, for centuries before the adoption of the constitution, a common law right.     All the authorities, without a single exception, hold that, under the constitutional right to acquire, possess and protect property, there is necessarily included the right to make reasonable contracts concerning it, which contracts are protected by the constitution.     In this, all agree.     And all agree, further, that the legislature may, in the exercise of its police power, absolutely forbid contracts which are inimical to public interests ; and, second, may adopt suitable regulations of contracts for the protection of the public.

The business of fire insurance being one which, from its nature, involves contracts with large numbers of persons in all parts of the commonwealth, who have not the opportunities of gaining the information necessary to intelligent bargaining, for their better security, the legislature may make such regulations as will protect them against fraud or imposition.   It may require that all who desire to transact business with the public, shall take out a license, shall make frequent reports of their financial condition; have fixed places of business where service of process can be had on them; that they shall deposit with the treasurer, or other officer of the commonwealth, bonds or other securities in sufficient amount to guarantee those with whom they contract against loss.   And generally may make all reasonable rules for the regulation of such business.   But can the legislature absolutely forbid the making of such a contract by individuals, and confer on corporations a monopoly of such business?

Is the business of fire insurance deleterious to the public? If so, the legislature may absolutely prohibit it.   But no one contends that it is.   On the contrary, it is admitted it is to the advantage of the public.   The legislature admits this by expressly authorizing artificial persons to conduct it.   If such contracts be not injurious to the public, and may not be altogether prohibited, then where is the authority to prohibit one class, natural persons, from entering into them, and specially empowering another and numerically a very much smaller class, artificial persons, to make them?   In so doing the state grants a monopoly in a particular business to a particular class.

As is said in substance in the Slaughter House Cases, 16 Wall. 102;   19th Pickering, 54; 13th Allen, 372, and many other cases, "All such grants relating to any known trade or manufacture, have been held, by all the judges of England, to be void at common law, as destroying the freedom of trade, discouraging labor and industry, restraining persons from getting an honest livelihood, and putting it in the power of the grantees to enhance the price of commodities."

A contract of indemnity against loss by fire, being a common law right, it cannot, by legislative grant, be monopolized by a small class, unless it has become of such public concern as requires its exercise by the state or by a corporation to whom the state's power is immediately delegated.   It may he admitted

that the business of constructing and operating public highways for the carriage of goods and travelers is exclusively in the state, and is of such immediate public interest that it can be transacted only by the state and such corporations as the state may specially authorize. But to carry on this business at all involves a right of eminent domain, which the state alone can exercise or grant, and therefore it ought not to be exercised by private individuals. There is not, and never was, a right in the individual to take private property for the construction and operation of a public highway, on which to conduct for profit the business of transportation; but there never was a time that the individual had not the right to make a contract to indemnify his fellow against loss by fire. This act is not obnoxious to the constitution because it authorizes corporations to insure against fire, but because it prohibits individuals doing a like business. It grants a monopoly of a particular business to a particular class; prohibits all others from engaging in it. This the legislature may, in the exercise of its police power, in some cases do. It may declare that females shall not be employed in some avocations; that children under a certain age shall not be employed in mines or factories; that none but men of good repute shall sell liquor by retail; and the wisdom of such legislation is not a question which the courts can consider; for it is adopted to promote the health, morals and good order of the public.

That in some of the states, the legislature has restricted the business of banking to corporations, has no analogy to the case in hand. The banking intended to be restricted by the New York act, was issuing of notes, receiving of deposits and discounting. In People v. Utica Ins. Co., 15 Johns. 358, and Bristol v. Barker, 14 Johns. 205, it was held that the act was only a restraining and regulating act, applying to associations of individuals; that as to them, to do a banking business they must have corporate authority. That an individual was not prohibited from doing a banking business, except as to issuing bank notes. It has always been held to be within the police power of the legislature to restrict the issuing of notes, intended to pass as money, to corporations. It is a matter which concerns the entire public, who have no opportunity, in the hurry of every-day business transactions of life, to ascertain the value of the promise which is tendered as money. But in a contract

of indemnity, why should not the citizen make his contract when and where the price and security suits him best? Why should the legislature take from the whole people their common law right of contract for insurance, and grant it to a particular class? Where is there the semblance of the constitutional exercise of the police power in this? Under the corporation act of 1874, and supplements, corporations for almost every business are authorized, such as supplying ice, printing and publishing, conducting hotels, drove-yards, livery-stables, lumbering, quarrying, mining, brewing, distilling, improvement and sale of real estate. In fact, almost every kind of business can be transacted by incorporated companies. All concern the public. If this act be constitutional, the legislature can prohibit the transaction of any business, if not conducted by corporations under the act of 1874, and under the pain of imprisonment forbid the individual engaging in any business whatever.

It is paternalism, to assume that citizens are incapable of prudently contracting with reference to their property without an express grant of the state in the shape of corporate franchise, to one of the contracting parties. It is an assumption that the citizen is a child, needing the tutelage and protection of the legislature in the ordinary affairs of business life. Or else it is a species of tyranny in government like that of Turkey, where the rights to produce, manufacture and trade, are all the subject of grant from the sultan.

If the exercise of the right of contract to indemnify be injurious to the public, then it ought to be prohibited; if beneficial, it ought not to be monopolized by a few.

The rule to be educed from Budd v. New York, 143 U. S. 528, the Elevator Cases; the Sinking Fund Cases, 99 U. S. 700, and all the cases where the police power of the state is discussed, is that, while a business affected by a public interest may be regulated, yet when not inimical to the health, morals or safety of the people, it cannot be prohibited. I do not think an exclusive grant to a class is regulation; that is prohibition of all others, and is therefore unconstitutional.

The judgment in my opinion should be affirmed, and the appeal dismissed.

Mr. Chief Justice Sterrett and Mr. Justice Green concurred in this dissent.