**LLOYDS OF TEXAS et al. v. BOBBITT, Atty. Gen.**

No. 11002.

Court of Civil Appeals of Texas. Dallas.
May 23, 1931.

Rehearing Denied July 3, 1931.

Alvin M. Owsley and Renfro, Ledbetter & McCombs, all of Dallas, and Phillips, Trammell, Chizum, Price & Estes, of Forth Worth, for appellants.

James V. Allred, Atty. Gen., Everett L. Looney, Asst. Atty. Gen., and McBride, O'Donnell & Hamilton, of Dallas, for appellee.

LOONEY, J.

The Attorney General of Texas instituted these proceedings against the Lloyds of Texas, an exchange organized to write insurance under the "Lloyds Plan," the individual subscribers (53 in number), and their attorneys in fact. The suit was for the appointment of a receiver to wind up the affairs of the exchange under article 5022, R. S., as amended by an act adopted at the First Called Session of the Forty-First Legislature, c. 11, § 1 (Vernon's Ann. Civ. St. art. 5022).

On an ex parte hearing, held May 16, 1930, without notice to defendants, the district judge appointed W. D. Prince receiver, with authority to take charge of the assets of the Lloyds of Texas, collect its past-due accounts, and, under orders of court from time to time, to do and perform other and further necessary and proper acts.

Defendants were cited to appear at the next regular (June) term of court, and show cause why the receivership should not be continued.

The receiver qualified, took possession of all records, assets, and affairs of the association, and began the active administration of his office.

No appeal was prosecuted from this interlocutory order, nor did appellants appear during the June term, but at the October term (on December 9, 1930) filed a motion to vacate the receivership and to remove the receiver. On December 23, 1930, the motion was amended and, after hearing evidence, the court overruled both the motion to vacate, and to remove the receiver, from which appellants prosecute this appeal.

1. Appellants challenge the correctness of the action of the court in appointing the receiver, but, as that order was not appealed from, the matter is not before us for review.

2. They deny that the Attorney General was authorized to bring the suit, because not requested by the board of insurance commissioners to institute the proceedings, that such request, if any, was made by the chairman of the board.

This contention is based on a provision of article 5022, supra, to the effect that, under circumstances named, "the affairs of such underwriters at Lloyds shall be wound up through receivership proceedings instituted by the Attorney General at the request of the Board."

There are several reasons why, in our opinion, this contention must be denied: (a) The Attorney General alleged "that as provided by said article (5022) the Board of Insurance Commissioners has requested your petitioner in his capacity as Attorney General of the State of Texas, to institute proceedings of receivership for the purpose of winding up the affairs of the underwriters at Lloyds of Texas, and brings this proceeding by reason of such request." Neither the legal capacity of the Attorney General to sue, nor his right to recover in the capacity in which he sued, was challenged by sworn plea (article 2010, R. S. 1925, subds. 2 and 3); therefore, as the question was not raised by pleading, it is not properly before us for consideration. But, even if presented properly, in view of the evidence, we would be compelled to overrule the contention. The evidence shows satisfactorily that, in all official acts performed by Mr. Tarver, including the request to the Attorney General for the institution of these proceedings, he was acting for the board. After giving testimony in regard to an examination of the affairs of the Lloyds, made in the spring of 1930, and on receipt of the report of this examination, Mr. Tarver said: We" (meaning the Board) communicated with the attorney in fact (of Lloyds), calling attention to the impairment of the guaranty fund, as disclosed by the report of the examiners, and called upon him to make good this impairment, which was not done; that

the attorney in fact sent a lawyer to see "us" (the board) in regard to the matter, and in this connection he said: "There was some discussion and the result of the matter was the calling of the meeting of those subscribers at Dallas."

The meeting referred to was held at the Baker Hotel on April 14, 1930. Subscribers present, representing 71 per cent. of the whole, decided unanimously to turn the exchange over to the "insurance commissioner" for liquidation, and also canceled all outstanding powers of attorney. Thereupon Mr. Tarver, as chairman of the board, took over the affairs of the exchange, but, doubting authority to liquidate in this way, unless authorized by all subscribers, he made an effort to obtain unanimous consent, and in this connection said: "I did not proceed with the liquidation because of the terms of the statute. Our view was that any one subscriber could raise objections to our undertaking to liquidate out of court. I tried to familiarize myself with the statutes. * * * Feeling that it was necessary, under the statute, unless we were able to get the consent of all subscribers to this procedure of liquidation, that court action was the only step left for the department to take, we asked for the appointment of a receiver under the orders of the court. The Attorney General was requested to file a petition of that character, which he did, resulting in the appointment of a receiver." This evidence, in our opinion, shows that Mr. Tarver was representing the board, and throughout expressed its will and executed its purposes. In the absence of evidence to the contrary, the presumption will be indulged in support of the validity of official conduct that neither the chairman of the board nor the Attorney General neglected any duty, but discharged same according to law. The contention that challenges the authority of the Attorney General to maintain the suit must be overruled.

3. Appellants make the further contention that the guaranty fund of Lloyds of Texas was not impaired, nor was the exchange insolvent within the meaning of the statute; hence the court erred in refusing to vacate the receivership.

The statute, article 5017b, enacted at the First Called Session of the Forty-First Legislature, c. 11, § 1, furnishes the following test of solvency: "In determining the solvency and arriving at the amount of net assets on hand belonging to underwriters at a Lloyd's for the purpose of this chapter, there shall be considered all the funds contributed to the Guaranty Fund by the Underwriters and the funds accumulated during the progress of the business and held for such underwriters by the attorney in fact, trustees or other officers. Underwriters at a Lloyd's shall be deemed solvent when the net assets on hand shall meet the requirements of this Chapter (Arts.

5013—5023a) after deducting from its gross assets all outstanding liabilities, including reserve liabilities, and when the contributed guaranty fund at least to the minimum required herein shall be unimpaired."

■■ In determining the sufficiency of the guaranty fund required to be maintained by article 5017b, which, in its last anlysis, determines solvency whether or not of the exchange under the statutory rule quoted above, notes of underwriters are not to be estimated; funds contributed by underwriters and those accumulated from business operations only are to be considered, and, although the notes of underwriters are gross assets of the exchange, they constitute no part of the minimum required to be on hand at all times for the immediate payment of losses, but belong to the reserve that may ultimately be drawn upon, if and when needed.

The board caused the affairs of the Lloyds of Texas to be examined by Hutcheson-Smith-Prince & Harris, public accountants of Dallas, of which Mr. W. D. Prince, who performed most of the work of examination, is a member. The result of the examination was, on March 29, 1930, reported to Hon. W. A. Tarver, chairman of the board, giving the status of the exchange as of December 31, 1929. As interpreted by the board, the report disclosed that the guaranty fund was exhausted, and that the exchange was insolvent. The testimony of Mr. Prince is to the effect that the guaranty fund was not only exhausted, but that liabilities exceeded the minimum prescribed by statute over $8,000. In these circumstances, Mr. Tarver brought this condition of the affairs of the exchange to the attention of the attorney in fact, requesting that the insolvency be made good, which, however, was not done. Later, a call was issued to the underwriters for a meeting to be held at Dallas April 14, 1930. On the date named the meeting was held at the Baker Hotel, Mr. Tarver presided, the report of the examiners was laid before and explained by Mr. Prince to the assembled subscribers, and, after due consideration, the underwriters, representing 71 per cent. of the entire body, unanimously adopted resolutions to the effect that the insurance commissioner should take over the exchange and appoint an agent to take charge of its affairs, re-insure such policies as could be re-insured, cancel all undesirable risk, and otherwise liquidate the exchange, as in his judgment was to the best interest of the underwriters; they also canceled all outstanding powers of attorney, and concluded the meeting by extending a vote of thanks to the department of insurance for the manner in which the investigation had been handled, and for bringing the condition of the exchange to their attention. The attorney in fact was represented at the meeting, and acquiesced fully in this action of the underwriters. Thereupon Mr. Tarver took over the affairs of the exchange and appointed Mr. Prince liquidating agent, who made an earnest effort to effect re-insurance of outstanding risks, but, failing in this, canceled all outstanding policies.

As the Lloyds plan contains no provision for a liquidation of this kind, Mr. Tarver thought unanimous consent of underwriters would have to be secured, so on April 29, 1930, he addressed a communication to the subscribers not present or represented at the meeting above mentioned, calling their attention to the action taken at said meeting, told them the exchange was hopelessly insolvent, and suggested that, if they approved the action of the majority, they should so indicate by signing and returning the ratification sheet inclosed for that purpose, concluding the communication by saying that, unless he secured unanimous consent, "We shall be compelled to request the Attorney General to institute receivership proceedings, as provided by law." In answer to this communication, all, except 5 per cent. of the whole, ratified the action taken at the Baker Hotel, but, as unanimous consent was not obtained, the board proceeded no further under the resolution. However, as the exchange was shown to be insolvent, within the meaning of the statute, and as re-insurance of its outstanding risks could not be effected, the board, acting through Mr. Tarver, requested the Attorney General to institute these proceedings for a receiver, in order to wind up the affairs of the exchange. Mr. Prince was appointed receiver, and on May 19, 1930, made an audit, which revealed that the affairs of the exchange had not improved since December 31, 1929.

■ In view of the uncontradicted testimony of both Mr. Tarver and Mr. Prince, and the further fact that the insolvency of the exchange was to all intents and purposes admitted by 95 per cent. of the subscribers, we are of opinion, and so hold, that its insolvency was satisfactorily, in fact overwhelmingly, established.

4. Appellants contend that the court erred in admitting in evidence, over their objection, the report of the examiners and the explanatory testimony of Mr. Prince. Appellants based their objection on several grounds, but the crux of their contention is that, in order to show that the exchange was insolvent, the examiner arbitrarily eliminated $270,073.55 of its assets.

■ We cannot accept appellants' view of this matter. The examiner eliminated $6,741.21, the amount of premiums overdue more than 90 days. The testimony showed, without conflict, that in insurance circles throughout the country the rule obtains that premiums more than 90 days past due are not considered available assets for the payment of losses. We therefore think this amount was correctly eliminated. The sum of $5,125 was the amount of unsecured notes of different

persons, deposited by subscribers in lieu of cash; these notes were unsecured other than by the personal worth of individual makers, and constituted neither cash nor "admissible securities," within the meaning of the statute, and were, in our opinion, properly eliminated. An unsecured open account for $200 was condemned by the test just stated, and properly eliminated. The item of $800 is the amount of rent for office space prepaid, and is in no sense either cash or an admissible security. The item of $29,024 represents the excess book value of certain securities deposited by underwriters over the pledged value, and was, in our opinion, neither primarily nor secondarily an asset of the exchange, but constituted simply an excess in the amount of securities deposited by subscribers, over the amount acquired by statute, and to which the exchange had no claim. The largest item eliminated is $198,800, the amount of underwriters' subscription notes. These notes constituted no part of the guaranty fund, were nonnegotiable, bore no interest, were payable only as demanded by the attorney in fact to meet future exigencies of business, and therefore properly eliminated from consideration. The two items—$540 and $28,843.34—aggregating $29,383.34, represent the excess value of corporation stocks deposited in the guaranty fund as convertible or admissible securities over its real or ascertained value. Appellants object strenuously to the method pursued by the examiner in ascertaining the value of these stocks. The examiner testified that his personal knowledge of the stocks was very limited, but that the inquiries made to ascertain these values were not limited; that very few of the stocks were listed, most of them being in closed corporations; that from his experience as an auditor he knew the real value of stocks is determinable from the value of property owned by the corporation; that they inquired of brokers and others possessing knowledge of the stocks, and upon information gathered in this way estimated the actual market value of the stock; and the difference between the value thus ascertained and the book values of these stocks is the amount of excess eliminated. Appellants' main contention is that the method pursued in determining these values was improper, and that the testimony was inadmissible.

The burden of proof, on the motion to vacate, was upon appellants, but they offered no evidence whatever to combat the case made by the Attorney General. The report of the examiners in evidence was obtained by the board in the discharge of official duty, and constituted sufficient basis, under the statute, for the proceedings that supervened. Mr. Prince was cross-examined fully by appellants, and the report was offered in evidence in connection with his testimony. We think the evidence admissible and that the amount of excess was properly eliminated.

But, even if it be conceded that the evidence as to the value of these corporation stocks was inadmissible, that the amount of the two items, to wit, $29,383.34, should have been considered a part of the guaranty fund, the result nevertheless would be the same, because the evidence, otherwise, showed conclusively that the minimum amount of assets ($60,000) required by statute (article 5017, as amended by Acts 41st Leg. [1929], 1st called Sess., c. 11, § 1 [Vernon's Ann. Civ. St. art. 5017]) had been exhausted, and further that liabilities of the exchange exceeded the minimum by $8,015.39; so, even if the amount of these items had been credited to the guaranty fund, it would nevertheless have been impaired to the extent of $38,632.05.

5. Appellants say that the amendments to the Lloyds plan, under which these receivership proceedings were begun, do not apply to or affect the business of the Lloyds of Texas, because it was organized under the law as it existed prior to the adoption of said amendments. The contention is to the effect that, when organized, the underwriters were required to maintain a guaranty fund of only $40,000 in order to write two kinds of insurance, whereas under the amendment they are required to maintain a guaranty fund of $70,000 to conduct the same character of business; that this placed upon them a burden they had not assumed in the original organization; that no provision of the former plan authorized a receivership proceedings by the Attorney General, at the request of the insurance board, and, as they did not obtain renewal of license under the amended statute, the same is not applicable to them, and, if enforced as to them, the effect will be to impair obligations of their contracts, and for these reasons appellants say that the receivership proceedings were not originally authorized, and should on motion have been vacated.

It is generally recognized that the business of insurance, being quasi public, is subject to regulation and control by the state. 14 R. C. L. 857, and authorities cited. This doctrine is also applicable to insurance business conducted under the Lloyds plan. 38 C. J. 160 § 12, and authorities cited. Insurance, under the Lloyds plan, is authorized in this state only under license issued by the insurance board (article 5016, as amended by Acts 41st Leg. [1929], 1st called Sess., c. 11, § 1 [Vernon's Ann. Civ. St. art. 5016]), without which insurance contracts on behalf of underwriters is not authorized. The license is neither a contract nor a charter, but a mere privilege granted by the state, and as such may be withdrawn, modified, or limited at any time. In the instant case, the minimum guaranty fund required when the attorney in fact of Lloyds of Texas was licensed was $40,000; thereafter, by amendment effective August 21, 1929, the minimum was increased to $60,000, and the same act

introduced a provision (article 5022) making it the duty of the Attorney General, on request of the insurance board, to institute proceedings to wind up the affairs of an insolvent Lloyds.

██ We do not think it can be correctly said that these changes in the statute impaired any contractual obligation, because the license issued under the former plan was held in subordination to the right of the Legislature to prescribe other and different regulations at any time, or to withdraw altogether the privilege of conducting an insurance business under the plan. The doctrine applicable to the situation in hand is, in our opinion, correctly stated in 17 R. C. L. 476, 477, § 5, as follows: " * * * Following the general principle that a license is not a contract, it is clear that it does not in itself create any vested right, or permanent right, and that free latitude is reserved by the Legislature to impose new or additional burdens on the licensee, or to alter the license, or to revoke and annul it. And this is the general rule notwithstanding the expenditure of money by the licensee in reliance thereon, and regardless of whether the term for which the license was given has expired. * * *" To the same effect see the following: 6 R. C. L. 199, § 195; Texas, etc., v. Gross, 60 Tex. Civ. App. 621, 128 S. W. 1173, 1175; State v. Bank of Mineral Wells (Tex. Civ. App.) 251 S. W. 1107, 1112; Jefferson, etc., Co. v. Tarver (Tex. Com. App.) 29 S.W.(2d) 316; German, etc., Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189, and authorities cited in note; Norfolk, etc., Co. v. Public Service Commission, 265 U. S. 70, 44 S. Ct. 439, 68 L. Ed. 904; City of Dayton v. City Railway Co. (C. C. A.) 16 F.(2d) 401; Knox v. Lee, Parker v. Davis (Legal Tender Cases) 12 Wall. 457, 20 L. Ed. 287, 311; Commonwealth v. Vrooman, 164 Pa. 306, 30 A. 217, 25 L. R. A. 250, 44 Am. St. Rep. 603; State ex rel. Attorney General v. Massillon, 110 Ohio St. 320, 143 N. E. 894. We therefore overrule the contention that appellants are not amenable to and controlled by the Lloyds plan, as amended.

Appellants also complain because the court refused to remove W. D. Prince, receiver, because of disqualification. Article 2294, R. S. 1925, provides that " * * * no party, attorney, or any person interested in any way in an action for the appointment of a receiver shall be appointed receiver therein."

██ The contention is that Prince was interested as a creditor; that his firm held a claim for services rendered the board in examining the affairs of the exchange, which, under the law, was chargeable against the underwriters. We do not think Prince was a creditor in a commercial sense, nor interested within the meaning of the statute.

Crawford v. Crawford (Tex. Civ. App.) 163 S. W. 115. The examiner's claim for compensation was primarily against the insurance board and per force of statute chargeable against the underwriters. However that may be, this question is out of the case, because Prince waived any claim he might have against the Lloyds, and stated specifically, both in pleading and testimony, that he had made no claim against appellants and would make no charge other than for services rendered as receiver.

We have given careful consideration to all assignments and propositions, and, finding no reversible error, the judgment of the court below is affirmed.

Affirmed.

### On Motion for Rehearing.

In paragraph 14 of their motion for rehearing, appellants contend that we erred in holding that the board (insurance commissioners) interpreted the report of W. D. Prince, examiner, made to W. A. Tarver, chairman, as disclosing that the guaranty fund of the exchange was exhausted, and showed a condition of insolvency. Appellants say: "Such holding and finding of fact by the Court of Civil Appeals is unsupported by and contrary to the evidence of the plaintiff, being the appellee herein." We based this conclusion upon the testimony of Mr. Tarver, who said: "I remember having an examination made of the Lloyds of Texas in the spring of 1930 in the course of my official duties. The firm of Hutchinson-Smith-Prince & Harris made the examination and the report of that firm was submitted to my office. Upon receipt of that report, we communicated with the attorney in fact, calling attention to the fact that the report disclosed an impairment of the guaranty fund, and calling upon him to make it good, but it was not made good." In a letter written April 19, 1930, to certain underwriters who failed to attend the meeting at Dallas April 14, Mr. Tarver said: "This department's audit reveals a hopelessly insolvent condition." In view of this and other evidence disclosed by the record, there can be no question but that the board proceeded on the idea that the report of the examiners revealed the insolvency of the exchange.

In paragraph 15 appellants say: "The court erred in holding that, the testimony of Mr. Prince was to the effect that the guaranty fund was exhausted, and that the liabilities exceeded the minimum prescribed by the statute by $8,000, for the reason that Mr. Prince did not so testify and there is not a scintilla of testimony in the records to support such a finding by the Court of Civil Appeals."

██ A scintilla of evidence means a mere spark, a trifle; hence to charge that the

court arrived at the conclusion in question "without a scintilla of evidence" is tantamount to saying that, we acted without any evidence whatever. The conclusion to which appellants leveled the criticism is this, we said: "The testimony of Mr. Prince is to the effect that the guaranty fund was not only exhausted, but that liabilities exceeded the minimum prescribed by statute over $8,000." Appellants' allegations that Prince did not testify as stated, and that our finding in this respect is "without a scintilla of evidence to sustain it," are, in the light of Prince's uncontradicted testimony, reckless and unwarranted, for Prince said: "My report, together with the anaylsis of the affairs of the Lloyds of Texas, disclosed the condition of the reserve fund, the guaranty fund. The assets of the company lacked $8,000 amounting to as much as the liabilities. The report shows that the guaranty fund, which should be $60,000, as required by law, instead of having the $60,000 it shows there was no guaranty fund, but that the liabilities exceed the assets by $8,015.39, as reflected by the records of the company."

In several paragraphs, appellants insist that we erred in finding that the board of insurance commissioners, through Mr. Tarver, chairman, requested the Attorney General to institute these proceedings. They say the uncontradicted testimony shows that Mr. Tarver acted independently of the board, and that the plural form of pronouns appearing in his testimony—such as "we," "us," and "our"—related to the joint action of Tarver, and Mr. Dexter Hamilton, associate counsel, and did not refer to the joint action of Tarver and other members of the insurance board. We do not think Tarver's testimony is susceptible of the construction contended for by appellants; on the contrary, as stated in the original opinion, we think the testimony shows that throughout Tarver acted in conjunction with other members of the board.

 The contention is further made that we erred in holding that the notes of subscribers held by the exchange could not be taken into consideration in determining the question of its solvency. We probably used inapt language; what we meant is, that under the arbitrary rule adopted by the Legislature (article 5017b) a Lloyds Exchange becomes insolvent when its minimum assets are either exhausted or fall below the prescribed level. While notes of underwriters are gross assets, they constitute no part of the guaranty fund, and cannot be considered in determining the sufficiency of the minimum assets required, at all times, for the payment of losses. The language of the original opinion will be corrected to conform to this idea.

After due consideration, we find no merit in appellants' motion for rehearing, and the same is overruled.

Overruled.