Equitable Loan Society, Inc., et al., Appellants, *v.*
Bell, Secretary of Banking, et al.

450

Argued April 15, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*William A. Schnader,* with him *Irving R. Segal, Bernard G. Segal, Morris C. Solomon, Joseph B. Winokur* and *Schnader & Lewis,* for appellants.

*Orville Brown* and *William M. Rutter,* with them *George J. Barco,* Deputy Attorneys General, and *Claude T. Reno,* Attorney General, for appellees.

OPINION BY MR. JUSTICE DREW, June 25, 1940:

The Pawnbrokers License Act, approved April 6, 1937, P. L. 200, provides for the licensing and regulating

of the business of pawnbrokers, empowers the Secretary of Banking to issue and revoke licenses, to make examinations and promulgate regulations, limits the interest and charges on loans, provides for the keeping of records by pawnbrokers, and prescribes penalties for violation of the Act. Approximately two weeks prior to October 1, 1937, the effective date of the Act, this bill in equity was filed to restrain the Secretary of Banking, and certain of his subordinates, from enforcing the Act against the sixty-three named plaintiffs (appellants here); and a preliminary injunction was issued. The bill alleged the Act to be unconstitutional in many respects. The preliminary objections raised by defendants having been overruled, they answered on the merits, and a final hearing was held. After the introduction of extensive testimony and the hearing of arguments upon the requests for findings of fact and conclusions of law, the learned court below entered a decree nisi, upholding the constitutionality of the Act, dissolved the injunction, and dismissed the bill. On February 15, 1940, plaintiffs' exceptions were overruled and the decree was made final. This appeal followed.[1]

This enactment is the first attempt at state-wide regulation of the pawnbroking business in Pennsylvania. Previously by statute, the control was lodged exclusively in municipalities.[2] At the present time there are between 150 and 175 pawnbroking establishments in the State, of

---

[1] The interest of each of the sixty-three appellants is separate and distinct; therefore the joint appeal to this court is improper: *Schuetz's Est.*, 315 Pa. 105. However, in view of the importance to the public of the questions to be decided, we shall treat the appeal as though it were properly before us.

[2] As to Philadelphia: see Act of March 8, 1823, P. L. 62; Act of February 24, 1859, P. L. 74. The business is specifically regulated by the Ordinance of January 19, 1856, as supplemented February 16, 1856; as amended by the Ordinance of June 22, 1908; as further amended by the Ordinance of March 17, 1919. By reason thereof, a pawnbroker is entitled to receive six per cent per annum as interest, and a sum not exceeding five per cent per month "for

which about 100 are located in Philadelphia. There has been considerable agitation for state supervision during the last fifteen years. The Department of Banking conducted a study of the business, especially with reference to the rates charged, reported the result of its investigation with recommendations to the legislature, and passage of the Act of 1937 followed.

In challenging the constitutionality of the Act, plaintiffs are faced with the familiar principle that he who asks to have a law declared unconstitutional takes upon himself the burden of proving beyond all doubt that it is so, since all presumptions are in favor of its constitutionality, and courts are not to be astute in finding or sustaining objections thereto: *Hadley's Case*, 336 Pa. 100, 104. "The legislature is the sole judge of the wisdom and expediency of a statute, as well as of the necessity for its enactment, and whether the legislation be wise, expedient or necessary is without importance

---

storage and other necessary expenses". See also: *Hunt v. Philadelphia*, 35 Pa. 277.

As to Cities of the Second Class: see Act of March 18, 1875, P. L. 7, section 7; Act of March 7, 1901, P. L. 20, art. XIX, section 3, cl. XXII. See also: *Scranton v. Engel*, 39 Pa. Superior Ct. 534.

As to Cities of the Third Class: see Act of May 23, 1874, P. L. 230, section 20, cl. 4; as repealed and supplanted by Act of June 23, 1931, P. L. 932, section 2601; as amended by the Act of May 22, 1933, P. L. 927; as further amended by the Act of July 12, 1935, P. L. 718.

See generally: *Foster's Application*, 23 Dist. 558, 559, 560, (affirmed 60 Pa. Superior Ct. 8).

The Act of May 7, 1907, P. L. 175, defined pawnbrokers and imposed a license tax, graduated according to gross annual receipts, upon them. Pawnbrokers are also required to pay a mercantile tax upon their business of retail merchandising done in connection with pawnbroking.

It is undisputed that each of the sixty-three plaintiffs had fully complied with the applicable portions of the above requirements, and was fully licensed and lawfully conducting business at the time the Act of 1937 took effect.

to the court in determining its constitutionality. In other words, the assembly has a free hand to legislate on every subject in such manner as it deems proper unless there is a constitutional prohibition clearly expressed or necessarily implied.": *Commonwealth v. Grossman,* 248 Pa. 11, 15.

The record is in large measure devoted to plaintiffs' attempt to prove that the charges allowed[3] for storage, insurance, and investigation, both as prescribed by the Act, and as actually established by the regulations of the Secretary of Banking, are so low as to be confiscatory and to deprive them of all opportunity to earn a reasonable return upon their capital invested in the pawnbroking business. As regards fifty-four of the plaintiffs, they did not produce anything to show the

---

[3] Section 12 of the Act provides, inter alia: "In addition to interest at the rate of six per cent (6%) per year, a pawnbroker may charge and collect from the pledger fees for storage, insurance, investigation, and other services which shall be—

"A. Not more than two per cent (2%) per month for the first three (3) months, and one and one-fourth per cent (1¼%) per month thereafter, nor less than one per cent (1%) per month on loans of fifty dollars ($50.00), or less, including renewals thereof, and one per cent (1%) per month on loans in excess of fifty dollars ($50.00) for which jewelry, watches, gems, gold or sterling ware has been pledged: Provided, however, That the Secretary of Banking shall, upon the effective date of this act, fix the fees within the limitations prescribed, and thereafter the Secretary of Banking may increase or decrease such fees within the limitations prescribed.

"B. Not more than two and one-half per cent (2½%) per month on loans for which other personal property has been pledged. . . .

"A minimum of twenty-five ($.25) cents on loans of five dollars ($5.00), or less, and a minimum of fifty ($.50) cents on loans in excess of five dollars ($5.00) may be collected on any loan for interest and charges."

Prior to the effective date of the Act, and in pursuance thereof, the Secretary of Banking, without notice or hearing, fixed one per cent per month as the maximum storage charge which might be made on loans of $50 or less, secured by pledges of jewelry, watches, gems, gold, or sterling.

effect of the new rates upon their businesses. They were content to stipulate that evidence should be presented as to but nine of the plaintiffs, and that their cases should be regarded as typical of all. Confiscation as to the other fifty-four could not possibly be shown in this way. Each individual business is a separate problem. The recurrence of such imponderables as efficiency and good will defies the attempt to make the conditions existing in a few businesses representative of those in all others. The burden of showing oppression from regulation is a heavy one (*Townsend v. Yeomans,* 301 U. S. 441, 451), and a person so objecting is required to demonstrate the unconstitutionality of its application as to himself alone, not as to the members of his class generally (see *Pennsylvania Railroad Company v. Driscoll,* 336 Pa. 310, 335). As to the nine selected plaintiffs, we have made a careful examination of the voluminous record as to the nature and scope of their businesses, and the statements and calculations showing the operations for the years 1936, 1937, and 1938, and our conclusion is the same as that of the learned court below, that plaintiffs failed to prove that the rates proposed are confiscatory. This is not surprising because the burden was extremely difficult to carry: see *City of Knoxville v. Knoxville Water Company,* 212 U. S. 1, 15, 18; *Hegeman Farms Corp. v. Baldwin,* 293 U. S. 163, 170, 171; *Townsend v. Yeomans,* supra, 451.

But even if confiscation had been shown, it would have made no difference, because the Commonwealth under its police power can prohibit the pawnbroking business entirely. Plaintiffs cannot, therefore, successfully claim a violation of their fundamental rights because of a regulation, falling short of complete suppression, which is not arbitrary, nor discriminatory, and which bears a reasonable relation to a proper legislative purpose.

Actions which are injurious to the public may be suppressed, prohibited, or regulated, and all private rights

must yield to the exercise of this paramount power. In *Commonwealth v. Vrooman,* 164 Pa. 306, 321, a case dealing with legislative regulation of the sale of fire insurance policies, Mr. Justice WILLIAMS said: "The police power of a state may be exerted for the complete or the partial control of a given business. It may prohibit it absolutely to all persons for the purpose of suppression. It may permit it to some persons and under certain restrictions in order to secure control over it and hold it within proper bounds: *Stone v. Mississippi,* 101 U. S. 814. The Sunday laws, the laws against gambling, against lotteries, against disorderly houses, the sale of liquors, the sale of oleomargarine, the sale of drugs, and many similar laws afford instances of the exercise of the police power for the complete suppression of a given line of employment, or for its restriction and control." There are many instances of entirely lawful callings, which have been forbidden by the legislature, and which have futilely invoked the due process clause in resistance to a necessary and appropriate exertion of the police power.[4] What the state can prohibit entirely, it can regulate: *Commonwealth v. Stofchek,* 322 Pa. 513, 519; *Illinois Cigarette Service Co. v. City of Chicago,* 89 F. (2d) 610, 612. The principle was thus expressed by Mr. Justice BROWN: "Uncompensated obedience to a regulation enacted for the public welfare

---

[4] As concrete illustrations: the sale and manufacture of liquor: *Mugler v. Kansas,* 123 U. S. 623; the sale and manufacture of oleomargarine: *Powell v. Pennsylvania,* 127 U. S. 678; the sale of cigarettes: *Austin v. Tennessee,* 179 U. S. 343; the sale of futures in grain or other commodities: *Booth v. Illinois,* 184 U. S. 425; the sale of stocks on margin: *Otis v. Parker,* 187 U. S. 606; billiard hall establishments: *Murphy v. California,* 225 U. S. 623; the sale of malt liquors: *Purity Extract and Tonic Company v. Lynch,* 226 U. S. 192; the sale of drugs by itinerant vendors: *Baccus v. State of Louisiana,* 232 U. S. 334; the sale of trading stamps: *Rast v. Van Deman & Lewis Company,* 240 U. S. 342; peddling: *Commonwealth v. Brinton,* 132 Pa. 69; the sale of filled milk: *Carolene Products Company v. Harter,* 329 Pa. 49.

or safety, under the police power of the State, is not taking property without due compensation, and any injury sustained in obeying such a regulation is but damnum absque injuria: *New Orleans Gas Light Company v. Drainage Commission of New Orleans*, 197 U. S. 453.": *Pennsylvania Railroad Co. v. Ewing*, 241 Pa. 581, 591. Mr. Justice WAITE struck the keynote common to all businesses, which have been held subject to complete prohibition or stringent regulation under the police power, when in *Stone v. Mississippi*, 101 U. S. 814, 821, he said: "They are not, in the legal acceptation of the term, *mala in se*, but, as we have just seen, may properly be made *mala prohibita.*"

The pawnbroking business falls within this class. It is a business subject to the strictest regulation under the police power: *Elsner Brothers v. Hawkins*, 113 Va. 47, 49; *The City of St. Joseph v. Levin*, 128 Mo. 588, 594; see *Commonwealth v. Danziger*, 176 Mass. 290, 291; *City of St. Louis v. Baskowitz*, 273 Mo. 543, 565. At common law, the taking of money for the use of money was prohibited. It was only by express legislative grace that the business of pawnbroking *(Foster's Application,* supra, 559), or for that matter the charging of interest by anyone *(Adinolfi v. Hazlett,* 242 Pa. 25, 29), was permitted in this Commonwealth. A privilege was given which the common law denied, and which the sovereign can withdraw or limit at any time. The fact that plaintiffs had paid the license tax exacted by the Act of 1907, and that they were lawfully operating under licenses granted by municipalities at the time the Act of 1937 became operative is immaterial. They did not by reason thereof acquire any vested right to continue in the business. For, as was said by Mr. Justice HOLMES, in *Truax v. Corrigan*, 257 U. S. 312, 342, 343: "It [an established business] is a course of conduct and like other conduct is subject to substantial modification according to time and circumstances both in itself and in regard to what shall justify doing it a harm." When Indiana pawn-

brokers raised a similar contention, Mr. Chief Justice SHAKE answered them in this manner: "Provisions for licenses of the character here involved are an exercise of the police power. Such licenses are not contracts and do not create vested interests. The sovereignty may give and the sovereignty may take away. *McKinney et al. v. Town of Salem,* 1881, 77 Ind. 213. The fees exacted for such licenses are not taxes. There is, therefore, nothing inherently obnoxious in the requirements that persons engaging in such business shall have two licenses, one issued by the state and another by a political subdivision or public corporation.": *Medias v. City of Indianapolis,* 23 NE (2d) 590, 594.

It will hardly be denied that the business of pawnbroking is almost certain to become inimical to the public good if conducted without restrictions. The history of the business is not encouraging. Thousands of men and women who patronize these establishments are driven by their necessities to accept loans upon any terms offered. It is so easy to take advantage of people in these circumstances, and the temptation to do so is so great, that experience teaches that the State must protect them. There is no equality of bargaining power. For these, and other reasons, the appellate courts of sister states have been uniformly of the opinion that a state may suppress or regulate the pawnbroker: *The City of St. Joseph v. Levin,* supra, 594; *Launder v. The City of Chicago,* 111 Ill. 291, 298; *Kuhn v. City of Chicago,* 30 Ill. App. 203, 204; *Elsner Brothers v. Hawkins,* supra, 49; see *The City of Grand Rapids v. Braudy,* 105 Mich. 670, 676; *City of St. Louis v. Baskowitz,* supra, 565, 566. In *Ex Parte Lichenstein,* 67 Cal. 359, 361, it was said: "It is well known that persons frequenting the offices of pawnbrokers are generally the reckless and needy and improvident, who require the protection of the law. To no other class of moneylenders do the same reasons apply. Men driven by the necessities of their situation resort to the pawnbroker, and

pledge any and all articles in their possession in order to raise money, and they are not particular about the rate of interest charged them." In *Medias v. City of Indianapolis,* supra, 594, ". . . there was much uncontroverted evidence that thieves and receivers of stolen property frequently resort to pawnbrokers as an outlet for their ill-gotten means . . .", and that ". . . where the pawnbroking business is strictly regulated larceny is greatly reduced." See also annotation thereto: 125 A. L. R. 598.

In answer to plaintiffs' assertion that pawnbroking is a legitimate enterprise, and should be treated as other businesses, we need only say that the legislature has now declared it to be unlawful and its conduct a misdemeanor unless carried on in conformity with the restrictions set forth in the Act of 1937. In this connection, Mr. Justice HENSHAW, in *Levinson v. Boas,* 150 Cal. 185, 192, said of pawnbroking: ". . . it is to be borne in mind that we are not dealing with a harmless and legitimate business requiring no regulation, and which, if licensed at all, could be licensed only for purposes of revenue. We are dealing with a business which is, and always has been, subject to police regulation, and which is unlawful if not conducted under the provisions, restrictions, and requirements of the law."

The remaining points require less discussion. It is a mistake to say that the Pawnbrokers License Act results in a denial of the equal protection of the laws because pawnbrokers are thereby treated differently than the lenders of money covered by the Consumer Discount Company Act of April 8, 1937, P. L. 262, and the Small Loans Act of June 17, 1915, P. L. 1012, as most recently amended by the Act of May 28, 1937, P. L. 989. The learned court below aptly answered: "These acts belong to a different classification and hence operate within their respective spheres." The legislature was fully aware of the features now urged as being common to all three businesses (Legislative Journal, 1937, p. 1073),

but chose to impose more stringent regulation upon pawnbroking. In view of the conditions and temptations known to exist in that business, we cannot label the classification unreasonable: see *Commonwealth v. Puder,* 261 Pa. 129, 137; *Baker v. Bryant,* 24 Cal. App. 87, 92. "If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the Fourteenth Amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law.": *Central Lumber Company v. State of South Dakota,* 226 U. S. 157, 160, 161. All lenders do not have to be dealt with alike; if the practice of one class makes extra precaution necessary as to them, ". . . it would be going an unwarranted length to hold that the state police power must either leave them entirely alone or else provide the same regulations, regardless of any need for them, for like loans made by all other classes of money lenders.": *In re Home Discount Co.,* 147 Fed. 538, 546. In *Ex Parte Sohncke,* 148 Cal. 262, 268, the court said: "The business of pawnbroking is one well known to the law, and constitutes of itself a distinct class of persons and things which may be properly regulated by a law applying to them alone. . . ."

Nor do we agree that "delegation running riot" results from the provisions empowering the Secretary of Banking to (a) grant licenses to pawnbrokers, (b) conduct investigations of pawnbrokers' establishments at their expense, (c) allow recovery by creditors on bonds filed by pawnbrokers, or (d) fix the rates as to certain types of loans within the narrow limits prescribed by the Act. In connection with the granting of licenses, in *National Automobile Corporation v. Barfod,* 289 Pa. 307, 311, 312, this court stated: ". . . in cases wherein the State is exercising its sovereign functions, such as the control of public officers, withdrawal of governmental prerogatives, and the granting of licenses . . . notice and hearing are not necessary. . . ." In all the above four in-

stances of the exercise by the Secretary of Banking of the enumerated powers, a right to judicial review of his administrative acts exists. The courts are always open to the victims of arbitrary or capricious action. In *Harris v. State Board of Optometrical Examiners*, 287 Pa. 531, 534, Mr. Justice KEPHART said: "Where the statute provides no right of appeal to the courts from the determination of administrative tribunals on constitutional grounds, the right will be implied: *Plymouth Coal Co. v. Pennsylvania*, 232 U. S. 531, 547; *Buffalo B. Mut. Film Corp. v. Breitinger*, 250 Pa. 225, 242."

It is urged that section 8 is objectionable in setting forth no standard as a guide to the exercise of official discretion. It is therein provided: "The Secretary of Banking shall have the power to reject any application for license [a] if he is satisfied that the financial responsibility, experience, character, and general fitness of the applicant or applicants is not such as to command the confidence of the community and to warrant the conclusion that the business will be operated honestly, fairly, and within the laws of this Commonwealth, or [b] if he is not satisfied that allowing such applicant to engage in business will promote the convenience and advantage of the community in which the business of the applicant is to be conducted. . . ." It is not difficult to find precedents to support the vesting of administrative bodies with a discretion so limited. In *Commonwealth v. Puder*, supra, where this court considered the constitutionality of the Small Loans Act, we expressly approved (p. 138) a delegation to the Banking Commissioner of the power to license applicants, the terms of which were defined by practically the identical language to be found in clause [a] above. As to clause [b], in *Bank of Italy v. Johnson*, 200 Cal. 1, the court had before it a case involving the delegation by the legislature to the Superintendent of Banking of the power to permit branch banks when ". . . he has ascertained to his satisfaction that the public convenience and advantage

will be promoted by the opening of the branch office." After reviewing the authorities, the court said (p. 15): "We therefore conclude that the discretion so lodged in the superintendent of banks in this state is a lawful delegation of authority to him." "Confidence", "convenience", and "advantage", are to our mind quite tangible attributes, but there can be no legislative definition of them that can automatically attach to or identify the individuals possessing them nor the exact situations to which they may become applicable, and necessarily some executive agency must be invoked. To heed plaintiffs' contention and to hold the delegation improper would take from government one of its most essential instrumentalities, of which the various national and state commissions are instances: see *Hall v. Geiger-Jones Company,* 242 U. S. 539, 553; *Noble v. English,* 183 Iowa 893; *State ex rel. The Port Royal Mining Company v. Hagood,* 30 S. C. 519, 525.

In conclusion, there is nothing in the suggestion that the title of the Act is defective under Article III, section 3, of our Constitution. Its language is clear and specific, and invites the attention of anyone interested to examine the body of the Act to find the precise details of the regulation of pawnbrokers. "We have repeatedly held that the title need only indicate the subject matter of the act and that it need not be a synopsis of it nor index all the subdivisions thereof, nor any matters that may be fairly related to it.": *Hadley's Case,* supra, 106.

Decree affirmed; appellants to pay costs.

SUPPLEMENTAL OPINION BY MR. CHIEF JUSTICE SCHAFFER:

I am of the opinion that the pawnbroking business is a lawful one and that it cannot be prohibited under our Constitution. Being a lawful business its prohibition would be an unconstitutional deprivation of property. Particularly would this be so as to those now engaged in the business.

I agree that it can be regulated, but the regulation as to charges must be reasonable and not confiscatory; the test whether the regulation is confiscatory, as I see it, is not whether some one individual cannot earn a reasonable return upon his invested capital and for his individual efforts, but whether no one can. I think this should be tested in each individual case, in the instances of existing businesses, and as to those opening in the future, by the answer to the query whether the business can be carried on by any one at a reasonable profit under the charges fixed.

I believe that the licensing feature of the act, giving the Secretary of Banking power to reject any application upon the sole ground that in his opinion the granting of the license will not promote the convenience and advantage of the community in which the business is to be conducted, would be unconstitutional as a delegation of arbitrary power by the legislature to an individual over lawful enterprises, without the fixing of standards by the legislature for the exercise of the licensor's discretion, unless there was a guarantee of judicial review which as I understand the majority opinion sanctions.

CONCURRING OPINION BY MR. JUSTICE LINN:

I agree that the bill should be dismissed on two grounds. First. None of the sixty-three parties plaintiff has been refused a license; until then, none should be heard to complain of the licensing provisions: compare *Interstate Buses Corp. v. Holyoke Street Railway Co.*, 273 U. S. 45, 52; *Smith v. Cahoon*, 283 U. S. 553, 562. Second. The pawnbroking business is subject to regulation by the state. This record shows that some of the plaintiffs, though complying with the statute, can make a reasonable profit. The fact that others cannot, does not permit the court to say that the statute takes property without due process; such persons are not required to stay in the business. But, while I think the

argument that the act is confiscatory as applied to such a business cannot be raised at all, if it can be raised the bill is bad for misjoinder of parties plaintiff, each party having a separate interest depending on separate evidence: see Equity Rule No. 36; *Komenarsky v. Brode,* 307 Pa. 156, 158, 160 A. 713; *Ryan v. Reddington,* 240 Pa. 350, 353, 87 A. 285; *Bishop v. Demonstration Co.,* 276 Pa. 101, 119 A. 831.

DISSENTING OPINION BY MR. JUSTICE STERN:

As I view it, the basic proposition upon which the structure of the court's opinion is erected in this case is erroneous,—namely, that "even if confiscation had been shown, it would have made no difference, because the Commonwealth under its police power *can prohibit the pawnbroking business entirely.*" This court had occasion, in an opinion filed as recently as May 13, 1940, in *Commonwealth v. Zasloff,* 338 Pa. 457, to discuss the power of the legislature wholly to prohibit an industry. It was there pointed out that the decisions allowing such suppression were all cases of businesses which were regarded by the community as "inherently and generally vicious," and that it was an unconstitutional deprivation of property for the legislature absolutely to prohibit a business which in itself was neither immoral nor otherwise inimical to the public welfare and where the abuses to which it might give rise were reasonably capable of correction by regulation. There were cited cases of the United States Supreme Court so holding,—*Adams v. Tanner,* 244 U. S. 590; *Weaver v. Palmer Bros. Co.,* 270 U. S. 402; *Tyson & Brother v. Banton,* 273 U. S. 418, 442, 443; *Fairmont Creamery Co. v. Minnesota,* 274 U. S. 1. In the Fairmont Creamery Co. case the court asked itself the question, "May the State, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and beneficial to the public and

not shown now to be accompanied by evil results as ordinary incidents?" And the court answered this question by saying, "Former decisions here require a negative answer." In the Zasloff case itself we held that a statute was unconstitutional which forbade sales of merchandise at less than cost, on the ground that such sales were an evil only so far as abuses occurred in connection with them, and therefore, while the legislature might seek to rectify such abuses, it could not prohibit *all* sales below cost.

Is the pawnbroking business so inherently vicious that the State would be constitutionally justified in preventing its citizens from engaging in it? Possibly the best answer to be found to this question is contained in the opinion of the court in *Asakura v. Seattle,* 265 U. S. 332, 343, where, although the court did not decide the question whether pawnbroking could be prohibited, it had this to say of the business: "While the amounts of the loans made in that business [pawnbroking] are relatively small and the character of property pledged as security is different, the transactions are similar to loans made by banks on collateral security. The business of lending money on portable securities has been carried on for centuries. . . . In this country, the practice of pledging personal property for loans dates back to early colonial times, and pawnshops have been regulated by state laws for more than a century. We have found no state legislation abolishing or forbidding the business. . . . While regulation has been found necessary in the public interest, the business is not on that account to be excluded from the trade and commerce referred to in the treaty. Many worthy occupations and lines of legitimate business are regulated by state and federal laws for the protection of the public against fraudulent and dishonest practices. There is nothing in the character of the business of pawnbroker which requires it to be excluded from the field covered by the above quoted

provision, and it must be held that such business is 'trade' within the meaning of the treaty."

It has been aptly said that the pawnbroker is the "poor man's banker." The differences between the business of a pawnbroker and that of a financier who makes loans to people of larger means are that, the loans in the one case being smaller and the expense of making them proportionately greater, the pawnbroker is compelled to resort to charges for storage, insurance, investigation and other services in connection with the loans, and also that the security, instead of being stocks and bonds, usually consists of tangible property. Poor people would have no way of borrowing money at all if it were forbidden them to obtain loans on the collateral of their ordinary personal and household possessions, and how could a state constitutionally abolish a business which consists of nothing more than the making of such loans? It is true that, as distinguished from the general banking industry carried on with more prosperous clients, certain abuses may tend to bring disrepute upon the pawnbroking business,—for example, as stated in the majority opinion, the exaction of exorbitant charges and the temptation to thieves to pawn, and pawnbrokers to receive, stolen property. These evils, however, are amenable to corrective regulation; the permissible fees may be reduced by legislative enactment and the receiving of stolen goods—at best a minor feature when compared with the overwhelming majority of legitimate transactions in the business—can be, and is, checked by government surveillance. It seems to me that it would be a distinct deprivation of a right of property and of contract, and therefore a violation of the Constitution of the Commonwealth as well as of the Fourteenth Amendment of the Federal Constitution, for the State to prohibit entirely the carrying on of a business which, in itself, is not only innocuous but in almost every age and clime has apparently proved to be essential to the economic life of those financially less fortunate.

While, therefore, in my opinion, the business of pawn-broking is one that cannot be constitutionally *prohibited* by the State, it can, of course, as plaintiffs themselves admit, be *regulated* in the exercise of the police power. But the regulatory power of the State is confined, in the case of all industries affected with a public interest, to acts of reasonable regulation, and, in the case of rate-fixing legislation, that means that the maximum charges prescribed must permit those engaged in the business to receive a reasonable interest return on their capital investment. To deny such opportunity is in effect to deprive the owner of his property in the capital itself, because it is the chief beneficial attribute of capital that it may be profitably invested. Certainly, if rates legis-latively fixed for public utilities must allow such a rea-sonable return, the same requirement, a fortiori, must exist in the case of the more private business of lending money.

During the course of an extended hearing plaintiffs produced a mass of testimony intended to demonstrate that the fees fixed by the act here in question for the storage, insurance, investigation and other services in-cident to the pawnbroking business did not allow of a reasonable return on the capital investment of their en-terprises. The issue thus raised was, to my mind, the essential one in the case, but the court below, instead of making findings of fact which would have made it pos-sible to ascertain therefrom whether the scale of fees established by the act was confiscatory, held in effect that this was immaterial because, whether confiscatory or not, plaintiffs had no standing to complain. In my opinion the record should be remitted to the court below in order that this fundamental question may become ca-pable of determination in the light of adequate factual findings necessary to its decision but now wholly lacking.

There are other rulings involved in the majority opin-ion which I believe to be not only erroneous but, if fol-lowed generally hereafter, likely to destroy the important

safeguard of our governmental system that the legislature cannot delegate its functions and confer arbitrary authority upon officials or administrative tribunals. The act provides that in certain cases the Secretary of Banking shall, within prescribed limitations, fix the fees that the pawnbrokers are to be allowed to charge for storage, insurance, investigation and other services, and that he may thereafter increase or decrease such fees. No standard or purpose to be attained is prescribed to guide the Secretary in doing this, but the matter is left to his uncontrolled discretion. The majority opinion holds that this is unobjectionable. That such a provision is a violation of our State Constitution follows necessarily from the principle so clearly and vigorously proclaimed in *Holgate Brothers Co. v. Bashore,* 331 Pa. 255, where the court said (p. 260) : "The legislature may, however, leave to administrative officers, boards and commissions, the duty to determine whether the facts exist to which the law is itself restricted. In all such occasions, nevertheless, the legislative body must surround such authority with definite standards, policies and limitations to which such administrative officers, boards or commissions, must strictly adhere and by which they are strictly governed." And the court further stated (p. 261), in regard to the power of the legislature to confer upon another agency the right to find facts upon which the law is to operate, that such facts generally are those *"not involving a personal decision as to whether the facts should be considered within the general policy of the law in question."*

Equally, and perhaps even more, violative of constitutional principles, is the provision that the Secretary of Banking is given by the act the power to reject any application for a pawnbroker's license, even though satisfied that the financial responsibility, experience, character, and general fitness of the applicant is beyond question, if he is not "satisfied that allowing such applicant to engage in business will promote the *convenience and*

*advantage* of the community in which the business of the applicant is to be conducted." It is suggested in the concurring opinion of Mr. Justice LINN that this provision will be properly before the court only when an applicant has been refused a license under it. But it is discussed and approved in the majority opinion and I consider it so indefensible as to warrant a present expression of views in regard to it. The majority opinion says of this provision that "It is not difficult to find precedents to support the vesting of administrative bodies with a discretion so limited." On the contrary, the precedents in the Supreme Court of the United States and in the various state jurisdictions would seem to be all but unanimous in indicating, by the principles they enunciate, that such a provision would be held invalid. Here, again, there is no standard prescribed for the exercise of the Secretary's discretion; it becomes necessarily a matter of his personal opinion as to whether the engaging in the business of pawnbroking by an applicant who is admittedly honest and in every way qualified will promote "the convenience and advantage" of the community. No criterion is suggested in regard to the granting or refusal of a license, as, for example, some limitation in the number to be granted in a given neighborhood. In the case of the liquor licensing Act of May 13, 1887, P. L. 108, the court of quarter sessions was directed to refuse a license whenever, in its opinion, it was "not necessary for the accommodation of the public,"—thus establishing the test of adequacy of supply for the needs of a locality. But here the "advantage" of the "community" constitutes the basis of no rule whatever other than that of the general public good, which, of course, is a question for the determination of the legislature and not of an agent authorized by it. I cannot imagine a discretion more unlimited than that thus given to the Secretary of Banking. As was admirably stated by Judge RHODES in *Kellerman v. City of Philadelphia,* 139 Pa. Superior Ct. 569, 575, 13 A. (2d) 84, 86:

"In every case to which we have referred, the actual enforcement of the law was controlled by a standard created by the avowed policy, purpose, or terms of the legislation itself, or adopted by the legislature from fields of exact science, but in any case in some degree extraneous to and independent of the mind and judgment of the enforcing officer. . . . But any legislative enactment which vests in a person or body of persons free of any standard independent of his or their own mind and judgment the power of supplying, or giving force to, or suspending its terms falls beyond the limits of judicial approval evidenced in the foregoing authorities, and is unconstitutional as a delegation of the power reposed exclusively in the legislature." No provision could be more baneful than one which permits a government official to say that one person may, and another may not, enter upon a legitimate business, without establishing any method by which a court would be able to determine whether such discretionary power has been properly exercised. The act does not even provide for hearing the applicant, or for an appeal to a court, the lack of which was held fatal to the constitutionality of a statute, where a similar discretionary power was sought to be given, in *Southern Railway Co. v. Virginia,* 290 U. S. 190. True, it is said in the majority opinion that a right of appeal is implied, but the cases cited in support of that proposition apply only to appeals on constitutional grounds, and in the recent decision of this court in *Commonwealth ex rel. Margiotti v. Cunningham,* 337 Pa. 289, 300, one of the grounds upon which a statute was held invalid was that it contained no express provision for appeal to a court from the decision of a public official. In any event, what could such an appeal here amount to? All that the Secretary of Banking need say would be that he was not "satisfied" that allowing the applicant to engage in the pawnbroking business would "promote the convenience and advantage of the community," and under the protection of that vague formula he could ar-

bitrarily grant or reject applications in violation of the proud ideal of our American system—equal justice to all under the law.

Because of the reasons stated, I would declare unconstitutional that clause of section 8 of the act which permits the Secretary of Banking to reject an applicant for a license if he is not satisfied that to grant it would promote the convenience and advantage of the community in which the business of the applicant was to be conducted; also that part of section 12 A of the act which gives to the Secretary the power to fix initially, and thereafter to increase or decrease, fees for storage, insurance, investigation, and other services in certain cases within the limitations therein prescribed. I would also reverse the decree of the court below and remit the record for findings of fact to be made as to the effect of the prescribed fees upon the possibility of those in the business receiving, under such a scale of charges, a reasonable return of interest on their capital investment, in order that it may be determined whether or not the fees fixed by the act are confiscatory and therefore violative of the State and Federal Constitutions.

Mr. Justice PATTERSON concurs in that part of this dissenting opinion which expresses the view that the State would have no right to suppress the pawnbroking business entirely, and consequently no right to impose a confiscatory schedule of charges, but only the right to regulate it.