Equitable Credit and Discount Company, Appellant, *v.* Geier.

446

Argued May 26, 1941.   Before Schaffer, C. J.,
Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Robert T. McCracken,* with him *Joseph Sharfsin* and
*David S. Malis,* for appellant.

*Orville Brown,* Deputy Attorney General, *G. Mason
Owlett,* and *Louis Caplan,* with them *Claude T. Reno,*
Attorney General, for appellees.

Opinion by Mr. Justice Stern, June 30, 1941:

Plaintiff is a Pennsylvania corporation engaged in the business of making loans in excess of $300, secured in each instance by an agreement in the form either of a bailment lease or conditional sale contract whereby it obtains a lien on the borrower's automobile. It made a loan to defendant in the sum of $325, repayment to be in twelve monthly instalments of $32.08 each, aggregating $384.96; this amounted to a charge for interest and fees of about 35% per annum, which was more than twice as much as would have been permitted under the terms of the Consumer Discount Company Act of April 8, 1937, P. L. 262. Plaintiff had never applied for a license under that act, and defendant, claiming that a rate of interest in excess of 6% per annum was therefore illegal, refused to make the payments called for by the agreement. This suit was brought by plaintiff to recover the entire debt, the maturity of which was accelerated by virtue of a provision to that effect in the contract. It was agreed by the parties, in a case stated, that if the court be of opinion that the Consumer Discount Company Act was constitutional, judgment should be entered for plaintiff for the amount of the loan with interest at the rate of 6% per annum only, or a total of $349.38, but if the act were found to be unconstitutional judgment should be entered in the full amount of $384.96.[1] The court, deciding that the act was constitutional, rendered judgment for the lesser sum. On this appeal, as in the court below, plaintiff challenges the validity of the act on the ground that it is a special law fixing the rate of interest and therefore is in contravention of Article III, section 7, of the Constitution of the Commonwealth,

---

[1] Plaintiff's position was that, except for the act, it could charge the larger sum because the debt was to be cancelled if the automobile was stolen or destroyed, relying on *Smith v. Orr*, 33 D. & C. 689.

and also that it is in conflict with Article I, section 1, of the State Constitution and with the Fourteenth Amendment to the Federal Constitution in that its interference with the freedom of contract cannot be justified as an exercise of the police power.

At the time this litigation arose thirty-seven licenses had been issued under the act.[2] The Commonwealth of Pennsylvania, together with the Pennsylvania Chapter of the American Industrial Bankers Association and eighteen consumer discount companies located in various sections of the state and holding thirty-five licenses,[3] intervened as parties defendant in support of the act.

The Consumer Discount Company Act provides that no person, partnership, association, or any other group of individuals however organized, except domestic business corporations organized under the Business Corporation Law of the Commonwealth, shall engage in the business of making loans in the amount of $1,000 or less and collect or contract for interest, commissions or other charges in excess of 6% per annum on the amount actually loaned or on unpaid balances if the loan is payable in instalments. Domestic business corporations organized under the Business Corporation Law may make such loans if they first obtain a license from the Secretary of Banking in accordance with the provisions of the act. In order to obtain such a license it is required that the title of the corporation contain the words "Consumer Discount Company," and the corporation must have a minimum subscribed capital of $25,000. There are elaborate provisions for annual reports by the licensees to the Secretary of Banking, for examinations by that official of their books and affairs, and for the revocation of licenses in case of violation of the provisions of the act or for other spe-

[2] The number has since been increased to fifty-five.

[3] The act requires a separate license for each place of business conducted by a licensee, which accounts for the fact that some of the companies have more than one license.

cified causes. Corporations licensed under the act are given authority to make loans not exceeding $1,000, either unsecured or on the security of real or personal property, and to contract for and collect, in addition to interest not exceeding 6% per annum, certain investigation and other fees, together with an additional charge for default. Excluded from the operation of the act are banking institutions, building and loan associations, credit unions, persons or corporations licensed under the Small Loans Act of 1915 or by the Secretary of Banking under the provisions of any other statute; there are also excluded bona fide sales of personal property by a person regularly engaged in the sale of such property wherein the purchaser may pay any part or all of the purchase price in stated instalments, and also bona fide sales under conditional sale contracts, leases or bailments. Penalties of fine and imprisonment are provided for violations of the act.

In *Commonwealth v. Puder*, 261 Pa. 129, 104 A. 505, it was held that the Small Loans Act of June 17, 1915, P. L. 1012, regulating the business of loaning money in sums of $300 or less to persons pressed by lack of funds to meet immediate necessities was not invalid as special legislation. The court there reiterated the well-known principle (p. 136, A. 506) that "Classification is a legislative question subject to judicial revision only so far as to see it is founded on real and not merely artificial distinctions, and, if the distinctions are genuine, the court cannot declare the classification void, though they may not consider the basis to be sound. The test is not wisdom, but good faith, in the classification." Considering the question whether there *was* a genuine distinction between loans under and those over $300 the court concluded (p. 137, A. 507) that the legislature had properly recognized that small loans "are necessarily attended with greater risk than is ordinarily incident to lending money by banks, pawnbrokers and others who loan only on approved collateral.

The fact that loans of this nature rarely exceed the sum of three hundred dollars is admitted, and the adoption of the amount named as a limitation affords a proper criterion for a classification in so far as the peculiar nature and character of the business is concerned." In *Engel v. O'Malley*, 219 U. S. 128, where the question was as to the validity of a statute requiring a license for those engaged in the business of receiving deposits for safekeeping, but exempting persons where the average sum received on deposit was not less than $500 during the preceding year, the act was sustained, and in the course of his opinion Mr. Justice HOLMES said (p. 138) : "It is true, no doubt, that where size is not an index to an admitted evil the law cannot discriminate between the great and small. But in this case size is an index. Where the average amount of each sum received is not less than five hundred dollars we know that we have not before us the class of ignorant and helpless depositors, largely foreign, whom the law seeks to protect."

The question now presented, in the light of the *Puder* case, is whether, under existing economic and social conditions, there is a "real" and not merely an "artificial" distinction between loans under and those over $1,000, as in that case there was recognized to be, at the time the Act of 1915 was passed, with reference to loans under and those over $300. In other words, is there a justifiable basis for the legislature's present selection of $1,000 as the criterion for differentiating classes of loan transactions in regard to permissible rates of interest and other regulations? No one, of course, can say that that amount is the exact point at which all loans change from one character or nature to another, but legislation dealing with social and economic problems cannot be expected, and is not constitutionally required, to be of mathematical exactitude. There are bound to be twilight zones furnishing support to critics who cavil at the want of scientific pre-

cision in the law. At least it may be said that in the case of the classification adopted in the Consumer Discount Company Act of 1937, as in that embodied in the Small Loans Act of 1915, the legislature did not *create* distinct classes but merely recognized the fact that they existed. Within the past few decades, beginning with studies published by the Russell Sage Foundation, there has grown up an impressive literature— the product of extensive social welfare research by economists and sociologists—dealing with the subject of consumer credit, consumers' loans as distinguished from producers' or commercial loans, and small loan legislation in general.[4] From this it appears that there are well-marked differences between consumers' and commercial loans in regard to the type of borrower, the nature of the security, and the terms upon which the credit is given. Consumers' loans are apt to exceed $1,000 in amount only in the rarest instances. Such loans are made to persons who desire the money for household or personal objects, for example, to finance the purchase of automobiles or furniture and equipment for the home, or to pay insurance premiums, doctors' and hospital bills or other items of emergency indebtedness. The usual type of borrower is a clerk or artisan capable of earning a modest living but without sufficient credit or the kind of collateral which would ordinarily be acceptable to a bank. Repayments are generally in monthly instalments. By means of

---

[4] Among such studies are Wassam, "The Salary Loan Business in New York City"; Ham, "The Chattel Loan Business"; Gallert, Hilborn and May, "Small Loan Legislation"; Robinson and Nugent, "Regulation of the Small Loan Business"; Hubachek, "Annotations on Small Loan Laws"; Chapman, "Commercial Banks and Consumer Instalment Credit"; Saulnier, "Industrial Banking Companies and Their Credit Practices"; Nugent, "Consumer Credit and Economic Stability"; Annals of The American Academy of Political and Social Science for March, 1938; "Consumer Credit and Its Uses," embodying a study made by the Advisory Committee of the Consumer Credit Institute of America.

such loans a large portion of the population, estimated at more than eighty per cent, has access to credit. Producers' loans, on the other hand, usually greater than $1,000 in amount, are made to commercial and industrial establishments on the basis of business credit. The borrowers are persons with capital resources. The loans are for short-term periods and repayable at one time instead of in instalments. If the law did not provide for higher charges on consumers' loans than on the larger commercial loans that type of credit probably could not exist, because the risk is obviously greater, the security is not so good, the duration of the loan is longer, and the operating expense necessary to investigate the borrower and to collect the periodic instalments is considerably higher.[5]

It should be reasonably clear, then, from what has been said, that in classifying loans with $1,000 as the dividing line between the classes, the legislature was not acting arbitrarily but was following the studies of competent investigators confirmed by the experience of recent years. Not only have several other states[6]

---

[5] By the same token the scale of charges established by the Consumer Discount Company Act on loans up to $1,000, while higher than the ordinary "legal" rate of interest, is lower than the scale of charges established by the Small Loans Act on loans up to $300.

[6] Arizona (4 Annotated Code of 1939, p. 261, Art. 9, § 51-901; also p. 262, Art. 10, § 51-1002); New Jersey (1936 Laws, p. 736, c. 238); Maine (Revised Statutes of 1930, p. 907, c. 57, § 27, par. XIX); South Carolina (Acts of 1935, p. 382); Wisconsin (Statutes 1937, p. 1570, Title XIV, c. 115, § 115.09). The amount is fixed at $2,000 in Kentucky (Carroll's Statutes Annotated, Baldwin's 1936 Revision, p. 1125, c. 72a, Art. 2 § 2223b-6), and at $5,000 in Colorado (Statutes Annotated, vol. 2, c. 18, Art. 5, § 154) and Rhode Island (General Laws 1938, p. 339, Title XVII, c. 145, § 10). In New York the amount ranges from $500 to $3,500 according to the population of the city in which the lending agency is located (4 McKinney's Consolidated Laws Annotated, 1940 supp., § 108). Many other states provide a variable maximum proportioned to the paid-in capital and surplus of the lending agency.

fixed this same limit of $1,000 in analogous legislation, but it is significant that the American Bankers Association, in recommending a draft of a uniform "Personal Instalment Loan Statute," has proposed this same amount as the maximum for loans to which the rate of interest and other charges allowed by such a statute should apply. Moreover, the Consumer Discount Company Act was passed on the basis of a report made by the Secretary of Banking to the House of Representatives on small loan companies and consumer credit, in which report the Secretary said: "We must, if we are to serve the public fully, . . . provide agencies to lend between the $300 limit imposed on the small loan companies and the $1,000 character loan which the average bank in our industrial and commercial centers sometimes finds difficult to lend. . . . The legislature, in seeking to provide adequate consumer credit, should be guided by two basic rules: the borrowing public must be protected against extortionate interest charges and the rates allowed must be sufficient to permit the lender to earn a fair return on his invested capital. Experience has shown that it is impossible to apply the first rule without also employing the second. . . . To provide a credit agency for loans up to $1,000 the Department recommends to the legislature the authorization of companies to be known as Consumer Discount Companies. . . . The Department believes that the establishment of such agencies in Pennsylvania will serve a useful purpose and meet a real need. They should enable prospective purchasers of automobiles and the more expensive types of household furnishings to obtain credit for such purchases at a standardized rate of interest far lower than that generally prevailing throughout the Commonwealth today." The court below was therefore well justified, in the course of its opinion, in asking the question: "Shall we say, without any precise knowledge on the subject, in the face of literature on the subject to the contrary,

and also in the face of an extensive report of the Secretary of Banking, made by direction of the House of Representatives, that there is now no need for a further regulation?" And the court properly answered its own interrogatory by saying that "To do so would be to substitute the judgment of the court for that of the legislature acting on a fact-finding report."

Plaintiff attacks the Consumer Discount Company Act as special legislation not only on the ground already discussed but because it exempts from its operation banking institutions, building and loan associations, credit unions, and persons or corporations licensed under the Small Loans Act of 1915 or by the Secretary of Banking under the provisions of other statutes. It is to be noted that similar exemptions were contained in section 7 of the Small Loans Act of 1915 as amended by the Act of May 28, 1937, P. L. 989, and also in section 30 of the Pawnbrokers Act of April 6, 1937, P. L. 200. These exempted institutions, all of which are covered by other legislation, differ from consumer discount companies in various ways, notably in the kind of collateral upon which their loans are ordinarily made. Such discrimination between different types of lending institutions is not a violation of the Fourteenth Amendment as denying the equal protection of the laws: *Griffith v. State of Connecticut*, 218 U. S. 563, 569-571; *Engel v. O'Malley*, 219 U. S. 128, 137, 138; *Mutual Loan Company v. Martel*, 222 U. S. 225, 235, 236; *Equitable Loan Society, Inc. v. Bell*, 339 Pa. 449, 458, 459, 14 A. 2d 316, 320. By section 3 of the Business Corporation Law of May 5, 1933, P. L. 364, any corporation which was previously incorporated and has accepted in any manner the Constitution of the Commonwealth is deemed to exist under that law; therefore licensees under the Consumer Discount Company Act are not limited to corporations organized since 1933. Nor is it objectionable, so far as the validity of the act is concerned, that individuals and partner-

ships are excluded from its privileges (see *Commonwealth v. Vrooman,* 164 Pa. 306, 320, 321, 30 A. 217, 220, 221), or that the act does not apply to bona fide sales of personal property on instalments and to bona fide sales under conditional sale contracts, leases or bailments. Of course, all sale or lease contracts which extend credit are, to a certain extent, akin to the making of loans, but where a greater charge is exacted in the case of a sale on credit than in a cash sale it is included in the selling price of the article. It being uniformly held that sellers are free to contract with buyers as to the terms and conditions of sales, the financing of sales of merchandise by the extension of credit has never been considered subject to the prohibition of usury or to regulations applicable to banking and loan transactions.[7]

Little need be said in rejecting the contention of plaintiff that the Consumer Discount Company Act is an invalid exercise of the police power and effects an unjustifiable impairment of the freedom of contract in violation of the State and Federal Constitutions. If there is anything well established in constitutional law it is that regulation of the rate of interest is a subject within the police power of the State, and this is especially true in the case of loans of comparatively small amounts, since the business of making such loans profoundly affects the social life of the community. "It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a State for the use of money loaned within the jurisdiction of the State is one within the police power of such State. The power to regulate existing, the details of the legislation and the excep-

---

[7] An interesting and comprehensive discussion of this subject is to be found in *Melnicoff v. Huber Investment Company,* 12 D. & C. 405, 407, 408; see also *Wilson v. J. E. French Co.,* 214 Cal. 188, 4 P. 2d 537; 66 C. J. 181-184, §§ 75, 76.

tions proper to be made rest primarily within the discretion of the state legislature, and 'unless such regulations are so unreasonable and extravagant as to interfere with property and personal rights of citizens, unnecessarily and arbitrarily, they are within the power of the State . . .' ": *Griffith v. State of Connecticut,* 218 U. S. 563, 569. At common law the taking of any interest whatever was illegal, and the right to charge it, being a privilege granted by statute, is subject to legislative control: *Adinolfi v. Hazlett,* 242 Pa. 25, 29, 88 A. 869, 871; *Commonwealth v. Puder,* 261 Pa. 129, 137, 104 A. 505, 507; *Equitable Loan Society Inc. v. Bell,* 339 Pa. 449, 456, 14 A. 2d 316, 319. It being shown that there was a valid reason for regulation, the exercise of the police power was justified, and the fact that the right to enter into contracts was thereby limited does not affect the constitutionality of the legislation enacted in the exercise of that sovereign power.

We shall not, on this record, pass upon the validity of specific provisions of the act not involved in the present appeal. Nor are we called upon at this time to decide whether the Consumer Discount Company Act of 1937 and the Small Loans Act of 1915 overlap in regard to loan transactions of less than $300 in amount. That question is one of statutory construction, not of constitutionality, and will be determined if and when the occasion arises.

Judgment affirmed.