## Applicability of Act No. 6 of 1974 to Vacation Home

356

To Honorable Carl Dellmuth

Secretary of Banking

PACKEL, Attorney General, June 7, 1974.—You have requested our opinion regarding the application of Act No. 6 of 1974[1] to sales of land in the so-called vacation home market. Typically, in this type of transaction, a developer subdivides lots, installs certain

---

[1] 41 PS §§101-605, approved on January 30, 1974. Act No. 6 generally retains six percent as the maximum legal rate of interest for loans or use of money in an amount less than $50,000 (section 201, 41 PS §201), but provides for flexible rates of interest for "residential mortgages" based on long-term United States government bond yields: section 301(b), 41 PS §301(b). Section 604, 41 PS §604, excludes all other acts providing special interest rates from the effect of Act No. 6, and the only act it specifically repeals is the Act of May 28, 1858, P. L. 622, as amended, 41 PS §§3-4.

amenities and recreational facilities, and sells lots to the public. Three main methods of selling and financing these lots have been brought to our attention by the Pennsylvania Vacation Land Developers Association. These are:

(1) a cash sale where the buyer provides his own financing;

(2) a sale under an installment sales contract where title to the land is held by the developer until final payment; and

(3) a sale where title is immediately transferred to the buyer in return for a note in which the buyer promises to pay the balance of the purchase price in installments.

In cases (2) and (3), the developer will normally discount the note or installment sales contract with a bank or other financing institution.

The purpose of Act No. 6 is to reform the general usury law and deal with problems regarding residential mortgages and liens on residential properties. It contains six articles, but the only ones we are concerned with here (aside from Article I which contains definitions) are Articles II and III, the former of which is concerned with interest rates generally, and the latter of which concerns interest on "residential mortgages," as defined in the act. The basic question to be answered is whether Article III applies to these sales of lots. The key to this question is whether the transaction involves a "residential mortgage." If it does, the maximum interest rate is a flexible one which will normally exceed six percent,[2] provided the other

---

[2] The legal rate of interest for June, 1974 under Article III is nine and one-half percent: 4 Pa. B. 949. Section 301(f)(ii), 41 PS §301(f)(ii), excepts obligations of $50,000 or less from the maximum interest rates provided by both Articles II and III, which are "evidenced by a security document and secured by a lien upon real property, other than a residential mortgage."

provisions of Article III are met. See sections 301(b), (d), 41 PS §§301 (b), (d).

"Residential mortgage" is defined as "an obligation to pay a sum of money in an original bona fide principal amount of fifty thousand dollars ($50,000) or less, evidenced by a security document and secured by a lien upon real property located within this Commonwealth *containing two or fewer residential units or on which two or fewer residential units are to be constructed* and shall include such an obligation on a residential condominium unit": Section 101, 41 PS §101. (Emphasis supplied).

The fundamental question which must be answered in determining whether the vacation land sale transaction comes within this definition is whether it involves real property "on which two or fewer residential units are to be constructed," because, at the time the property is transferred, it is a vacant lot. While it is normally anticipated that a residential structure or some type of bulding will be constructed, it is often uncertain as to when this will be done, or whether it will be done, since the buyer may elect not to construct any building on the lot. In addition, a question is raised as to whether a vacation home is, in fact, a "residential unit."

In our opinion, the determining factor is the interest of the lender or seller in the ultimate construction of a "residential unit." This factor is critical not only in the vacation sale transaction, but in any sale of land. Unless the lender is in some way involved in financing the construction of a residential unit, it would be impossible for the lender to ascertain whether a particular vacant lot would meet the criteria of a residential mortgage. A borrower might certify that a residential unit is or is not to be constructed, but the lender could not hold the borrower

to such a certification or the borrower might, in good faith, change his mind. We do not believe that Act No. 6 can operate on such uncertainties. We are, therefore, of the opinion that the residential mortgage provisions were not intended to cover simple land sales, unless the construction of the residence is included either in the agreement of sale or in a separate agreement approximately contemporaneous with the agreement of sale. We note that the definition of "actual settlement costs" in section 101, 41 PS §101, allows a service charge, which, "in the case of a construction loan" may be as high as two percent of the original principal amount of the loan. It is, therefore, clear that a "residential mortgage" exists where a lender finances both the sale of the lot and construction of the residence. Where only the financing of the sale of the lot is involved, a "residential mortgage" would nevertheless exist if the agreement requires that a residence be constructed within a certain period of time or states that the seller or some other contractor will construct a residence. If, on the other hand, these conditions do not exist, or if the agreement or deed specifically states that no residence is to be constructed,[3] then the requirements of a residential mortgage are not met.

Furthermore, in our opinion, the fact that the buyer might be using the property as his second residence or vacation residence makes no difference. In terms of regulation, it would be impossible to make legal distinctions on this variable. Different persons might purchase the same lot. For one, a rustic, it would be

---

[3] We are advised that some vacation land sale developments are for camp sites only and *prohibit* construction. Such developments would not be subject to Article III of Act No. 6, nor would they be subject to the limitations of Article II under section 301(f)(ii), 41 PS §301(f)(ii).

his only residence; for another, it might start out as a second residence and become a primary residence. The application of Article III cannot be practically determined by these factors, nor need it be. The definition speaks in terms of whether a "residential unit" is to be constructed, not whether it is the only residence of the individual. Accordingly, so long as the contemplated structure is a residential-type structure, the requirements of this section are met.

Based on the foregoing observations, which can only be general in nature, we recommend the promulgation of regulations by your department specifying how a determination may be made whether a "residential unit" is "to be constructed" on land.

We next analyze the three main methods of selling and financing, bearing in mind that before Article III can apply to any of them, they must meet the initial hurdle of constituting land on which a residential unit is to be constructed.

(1) *A cash sale where the buyer provides his own financing.*

Where a buyer pays cash, Act No. 6, of course, has no application. Where however, a buyer or seller arranges financing from other than the seller, the transaction would be subject to Article III under the circumstances discussed in (3), infra. If it did not meet the requirements of a "residential mortgage," it would be exempt from both Articles II and III under section 301(f)(ii), 41 PS §301(f)(ii).

(2) *A sale under installment sales contract where title to the land is held by the developer until final payment.*

Upon our review of this type of transaction, we reluctantly conclude that it does not appear to be covered under either Articles II[4] or III of Act No. 6. Article II

---

[4] Our inquiry into the applicability of Article II is necessary

governs the interest rate on "the loan or use of money." Under cases construing the prior usury law, Act of May 28, 1858, P. L. 622 (found, before repeal, at 41 PS §3), our courts construed similar language not to include installment sales of merchandise on credit. See Equitable Credit and Discount Co. v. Geier, 342 Pa. 445, 455 (1941); Equipment Finance, Inc. v. Grannas, 207 Pa. Superior Ct. 363 (1966); Lansdowne Finance Co. v. Prusky, 120 Pa. Superior Ct. 555 (1936); Personal Discount Co. v. Lincoln Tire Co., 67 D. & C. 35 (1949); Melnicoff v. Huber Investment Co., 12 D. & C. 405, 407-08 (1929). These cases have never been overruled in Pennsylvania.

The theory of these cases is found in Geier, supra: "[i]t being uniformly held that sellers are free to contract with buyers as to the terms and conditions of sales, the financing of sales of merchandise by the extension of credit has never been considered subject to the prohibition of usury or to regulations applicable to banking and loan transactions": 342 Pa. at 455. The parties may thus "agree on one price if cash is to be paid and upon as large an addition to cash price as may suit themselves if credit be given, and it is wholly immaterial whether the enhanced price is ascertained by the simple addition of a lumping sum to the credit price or by a percentage thereof ": Melnicoff v. Huber Investment Co., supra at 408. While these cases involve merchandise, the rationale would apply equally to the sale of real property, and, interestingly enough, the seminal case espousing this doctrine did involve the sale of real property." Hogg v. Ruffner, 66 U. S. 115 (1861).

---

because of our conclusion, infra., that this type of transaction is not "secured by a lien upon real property." Accordingly, the exemption from Article II otherwise provided by section 301(f)(ii), 41 PS §301(f)(ii), is not applicable.

We do note, with considerable interest, that the effect of these cases has been considerably limited by legislation. The doctrine no longer applies to installment sales of certain goods and services used primarily for personal family or household purposes,[5] installment sales of goods or rendition of services for home improvements,[6] and installment sales of motor vehicles.[7] An extremely interesting question may be raised as to whether the General Assembly, through the passage of these acts, has in effect changed the common law of the Commonwealth so as to abolish the doctrine excluding installment sales from usury. See Landis, Statutes and the Sources of Law, Harvard Legal Essays 213 (1934).

In addition, courts in other states have abrogated the doctrine in recent years[8] and it is possible that our Supreme Court might also do so. While these inter-

---

[5] See Goods and Services Installment Sales Act of October 28, 1966, Sp. Sess., P. L. 55, 69 PS § 1101, et seq.

[6] See Home Improvement Finance Act of August 14, 1963, P. L. 1082, as amended, 73 PS § 500-101, et seq.

[7] See Motor Vehicle Sales Finance Act of June 28, 1947, P. L. 1110, as amended, 69 PS § 601, et seq.

[8] The seminal case is State v. J. C. Penney Co., 48 Wis. 2d 125, 179 N. W. 2d 641 (1970). This case was followed in Rollinger v. J. C. Penny Co., 86 S. D., 154, 192 N. W. 2d 699 (S.D. 1971) and State ex rel. Turner v. Younker Brothers, Inc., 210 N. W. 2d 550 (Iowa 1973). Other states have declined to follow Wisconsin. See Johnson v. Sears Roebuck & Co., 14 Ill. App. 3d 838, 303 N. E. 2d 627 (1973); Standard Oil Co. v. Williams, 288 N. E. 2d 170 (Ind. 1972); Sliger v. R. H. Macy & Co., 59 N.J. 465, 283 A. 2d 904 (1971). The most recent cases are collected in Cecil v. Allied Stores Corp., 513 P. 2d 704, 707-709 (Mont. 1973) and in Annot., Validity and Construction of Revolving Charge Account Contract or Plan; 41 A. L. R. 3d 682 (1972) and supplements. See also, Annot., Advance in Price for Credit Sale as Compared with Cash Sale as Usury: 14 A. L. R. 3d 1065 (1967).

esting speculations may be raised, we believe that in our role as the legal advisor to State government,[9] we are bound by the final decisions of Pennsylvania courts. We therefore conclude that there is not a loan or use of money in such transactions and Article II does not apply.

We next turn to whether the transaction is nevertheless covered under Article III of Act No. 6 as a residential mortgage.[10] We face this question because in our opinion, Article III is not simply an exception to Article II, but rather an independent section governing "residential mortgages" whether or not the transaction involves the loan or use of money. Our reason for this conclusion is the legislative intent found in §301(a), 41 PS §301(a) to establish a flexible maximum rate for "residential mortgages." While the heading of Article III is entitled "Exceptions to Maximum Lawful Interest Rate," it is not controlling: Section 1924 of the Statutory Construction Act of November 25, 1970, P. L. 707, as amended, 1 Pa. S. §1924. Nor is the language in section 201(a), 41 PS §201(a), controlling. That section simply means that Article III is an exception to certain Article II transactions, not that it applies only in transactions which would come under Article II. Otherwise, purchase money mortgages of residential units, which are clearly within the definition of "residential mortgage" and within the legislative intention, but do not involve

---

[9] Sections 512, 902 of the Administrative Code of 1929, 71 PS §§192, 292.

[10] The discussion of this question assumes that the initial hurdle discussed above—that the transaction involves land upon which a residential unit is to be constructed—has first been overcome.

the loan or use of money under Article II, would not be covered by Article III. In our opinion, therefore, to read Article III as simply an exception to Article II would frustrate the legislative intent.

Turning to the question, however, it is our opinion that the definition of residential mortgage does not clearly cover this transaction. In addition to the question discussed above regarding the construction of a residential unit, we are of the opinion that the requirement that the obligation be secured by a lien upon real property is not met where the seller simply retains title. While it might be argued that the retention of title is the ultimate lien on real property, the statute is ambiguous .on this score,[11] and we do not believe that it covers such installment sales of real estate where title does not pass. We are further supported in this conclusion by the title of Act No. 6 which nowhere gives notice that it would cover an installment sale of real estate where title is retained.[12] In view of the abuses that the General Assembly has noted in this

---

[11] The ambiguity in a statute is further enhanced by the requirement in the definition of "residential mortgage" that the obligation be evidenced by a "security document." "Security document" is defined in section 101 to mean a "mortgage, deed of trust, *real estate sales contract* or other document creating upon recordation a lien upon real estate." (Emphasis supplied.) Normally, a real estate sales contract does not, upon recordation, create a lien upon real estate. Rather, it evidences an equitable interest in favor of the buyer rather than a lien for the purchase price in favor of the seller. While we recognize this further ambiguity, it does not change our position, because there may be instances where real estate sales contracts would, or could, contain provisions favorable to a seller which possibly could create a lien. We recommend this to the General Assembly for further clarification.

[12] See Pennsylvania Constitution, Art. III, § 3.

type of transaction,[13] we recommend that the General Assembly amend Act No. 6 to clarify this situation, since persons purchasing under installment contracts are often the persons who most need protection against an excessive rate of interest.

(3) *A sale where title is immediately transferred to the buyer in return for a note whereby the buyer promises to pay the balance of the purchase price in installments.*

In our opinion, this type of transaction would be covered by Article III of Act No. 6, if the sale involves real property on which a residential unit is "to be constructed," as we defined that term above. Where a seller conveys title to such property to a buyer and takes back either a note or other form of indebtedness covered under the definition of "security document," in our opinion, a "residential mortgage" is created if the other requirements of the definition are met. This type of transaction meets the other requirements of Article III missing in (2) above.

(4) *Involvement of Financial Institutions.*

In all of the above discussions, we have assumed a simple transaction between a seller and a buyer. It is true that in the large majority of cases, the seller will then discount the agreement or note with a bank or other financial institution. Nevertheless, based on the cases we have discussed, the mere sale of such agreements or notes does not convert the transaction to a "loan or use of money." However, there may be instances where the financial institution is intimately involved in the entire transaction, as, for example,

---

[13] See Installment Land Contract Law of June 8, 1965, P. L. 115, 68 PS §901, et seq., which, however, applies only to Philadelphia and Allegheny Counties: Section 3(a), 68 PS §903(a).

where a bank or other financial institution agrees with a developer to buy all the developer's sales agreements or loans; where the developer guarantees the loan; where the developer uses the forms of the bank; or where the credit of the buyer must be approved by the bank before the developer will sell the property to him on an installment basis. It may be argued that this type of involvement does convert the transaction into a loan or use of money.

There is no prior Pennsylvania appellate case law on this question. The lower court cases reach different decisions without explaining satisfactorily the basis of those differences. Compare Medical Dental Business Service of New Jersey, Inc. v. Morrison, 51 D. & C. 552 (1944), and Professional Service Credit Association, Inc. v. O'Hara, 40 D. & C. 291 (1940), with General Motors Acceptance Corp. v. Freeman, 63 D. & C. 163 (1946). An attempt to explain these decisions is found in Weaver, Grose, Langhart & May, Inc. v. Myers, 17 D. & C. 2d 405 (1958). The court there stressed the facts of each case as being important determinants and distinguished cases involving subsequent sales of paper from those involving the original creation of obligations.

Accordingly, since the law is not clear, we believe that your department should keep close surveillance on the involvement of financing institutions in these types of transactions so that appropriate action, by way of legislation, regulations or litigation by this office may be instituted where indicated.

We trust the above discussion has been helpful in setting forth some of the parameters of the transactions which come under Act No. 6. We have no doubt but that there will be additional problems which will arise under the act, and we stand ready to be of such further assistance as we may be called upon to render.