## Psomas v. Approved Bancredit Corp.

*Gilbert J. Helwig*, for plaintiffs.
*Michael W. Huron*, for defendant.

PRICE, J., Chancellor, February 9, 1965.—This proceeding is brought under the Act of April 3, 1851, P. L. 868, 21 PS §684, which provides that where the amount of the mortgage debt is disputed, as in the present case, a mortgagor, by paying into court a sum of money sufficient to cover the largest possible amount of the debt plus poundage, may have his mortgage sat-

isfied as of record so that a clear title may be conveyed or a first mortgage may be given to a subsequent mortgagee. The proceeding is equitable in nature and its purpose is to determine the rights of the parties in order to distribute the fund thus created and now on deposit with the Prothonotary of Allegheny County in the sum of $10,550.

### STATEMENT

Plaintiffs, Charles and Mary Jane Psomas, were owners of a vacant lot in Crescent Township early in 1962. They were at all pertinent times residents of the Commonwealth. On April 18, 1962, they went to the office of Albee Tri-State Homes, Inc. (Albee) in Hickory, Pa., a Pennsylvania corporation, for the purpose of purchasing a prefabricated shell to erect on their lot. Before leaving they signed a purchase order (plaintiffs' exhibit #1) for a shell at a cash price of $9,018.60, less $18.60 down payment in cash, plus interest on an installment purchase plan for a five year period. There were to be 60 payments of $90 each, except that the last payment was also to include the balance of the principal. The purchase order and other documents bearing plaintiffs' signatures were assigned by Albee to defendant on May 5, 1962. The purchase order is the basis for this litigation.

It is plaintiffs' claim that except for the purchase order, all the other documents involved, bearing their signatures, a promissory note (defendant's exhibit "B"), a bond (plaintiffs' exhibit #3), and a mortgage (plaintiffs' exhibit #2) to secure the note, were signed in blank; that Albee's agent was authorized to fill in the blanks, but only in accord with their agreement. Mrs. Psomas alleged that the agent said they would have to pay only $9,000 and "very little interest", no definite figure having been set; however, she admitted that the blanks pertaining to time purchase were filled in and that she saw that information. Plaintiffs denied ever

appearing before a notary public to acknowledge the bond and mortgage. Plaintiffs made 14 payments totaling $1,260 to defendant after having received their book of coupons for payments, beginning in June 1962 and ending in July 1963. The covering letter (plaintiffs' exhibit #9) received with the coupon book contained the interest terms of $2,790 over the five years and the balance which would remain after the 59 payments of $90. Thus, plaintiffs knew in June of 1962 the terms of their loan in gross figures. They still did not know how much of each payment would be devoted to interest and how much would go toward repayment of the principal. They did not and do not know what rate of simple interest they are paying. It is admitted by defendant that the rate is slightly in excess of six per cent on a non-reduction basis. The rate is less than 12 percent because some slight inroads were made on the principal. Hence, the rate is somewhere between 6.1 and 12 percent, and much closer to the latter than to the former. For the purposes of this adjudication, the exact percentage need not be ascertained.

In August 1963, counsel for plaintiffs tendered a check for $8,655 in full payment of the debt. Defendant refused the tender, insisting that $8,967.04 was due.

Early in December 1963, defendant, claiming to be a holder in due course of the note from Albee, demanded $9,294.83 in complete satisfaction of the debt, although $10,530 was the entire outstanding balance, which, by reason of the default, had become due and payable immediately, according to the terms of the note. On December 20, 1963, defendant sent notice of its intention to foreclose because plaintiffs had been in default since August. Thereafter, on January 16, 1964, plaintiffs petitioned under the Act of April 3, 1851, supra. The order directing satisfaction of the mortgage was entered on March 13, 1964.

The issues involved are: (1) Whether the transaction was a time payment purchase or a loan, (2) if a loan, whether the rate of interest was usurious and excessive and, (3) whether the presentation of the certified check for $8,655 was proper tender as would stop the running of interest.

From the pleadings, evidence and testimony presented, the chancellor makes the following

### FINDINGS OF FACT

1. Plaintiffs, Charles Psomas and his wife, Mary Jane Psomas, are individuals residing in Allegheny County, Pa.

2. Defendant, Approved Bancredit Corporation, is an Ohio corporation having its only office at 12 West Church Street, Niles, Ohio, and being engaged in the investment business.

3. Plaintiffs are now, and were at all times relevant hereto, owners of certain real estate in the Township of Crescent, Allegheny County, Pa., being lots A, B and C in the survey laid out for Mary Gnjatovich and George Gnjatovich by Edward D. Mosko, Registered Engineer, in July of 1959; said lots being parts of lots nos. 158, 159, 160, and all of lots nos. 168 and 169 in the Spring Run Heights Plan of Lots laid out for H. C. A. Hofacker by Edeburn, Cooper and Company in June of 1938, and being recorded in the Recorder's Office of Allegheny County in P. B. vol. 47, pp. 145-47; being more particularly described as follows:

"Beginning at a point on the northwesterly side of Locust Road at a point on the dividing line between Lots Nos. 167 and 168 in said plan; thence along said dividing line N 32° 00′ W a distance of 160 feet to a point in Lot No. 160; thence S 58° 00′ W a distance of 128.06 feet to a point on the northeasterly side of Anderson Street; thence along said side of Anderson Street S 36° 40′ E a distance of 142.10 feet to a point;

thence by the arc of a circle curving to the left on Locust Road with a radius of 20 feet a distance along said arc of 29.79 feet to a point on the northwesterly side of Locust Road; thence along said road N 58° 00′ E a distance of 96.57 feet to a point at the place of beginning".

These are the same premises which H. C. A. Hofacker and Florence W. T. Hofacker, by their deed dated September 6, 1939, and recorded in the Recorder's Office of Allegheny County in deed book vol. 2631, page 277, granted and conveyed to John Harabich, who conveyed to Mary Gnjatovich by his deed dated October 30, 1939, and recorded in deed book vol. 2643, page 282.

They are also part of the same premises which H. C. A. Hofacker and Florence W. T. Hofacker, by their deed dated August 9, 1941, and recorded in the Recorder's Office of Allegheny County in deed book vol. 2691, page 724, granted and conveyed to Mary Gnjatovich, who, with her husband, by their deed dated April 10, 1962, conveyed to the Psomases as recorded in deed book vol. 3987, page 191.

4. On April 18, 1962, plaintiffs entered into a contract with Albee Tri-State Homes for the purchase of a shell, garage and certain other building materials for a cash purchase price of $9,018.60, paying $18.60 down. They admitted having seen and signed this instrument as presently constituted and represented in plaintiffs' exhibit #1, with all blanks filled in before signing. The purchase order blank contains a set of terms governing the obligations of the parties. About two thirds of the way through the terms, there appear the words:

"In addition, if a time purchase:

"12. The time balance will be payable in 60 monthly installments of $90 each, followed by a final monthly installment which will consist of all sums remaining unpaid, including time charges, if any; and the Cus-

tomer agrees to execute a note evidencing his obligation to pay such time balance and to secure the same with a mortgage on the building site".*

5. The purchase order or contract contains none of the other time purchase payment terms, but only the cash price for the shell.

6. At the same time they signed the contract, plaintiffs affixed their signatures to mortgage, bond and note forms, all in blank.

7. The mortgage and bond were not acknowledged by plaintiffs before a notary public either when signing the purchase order or at a later date.

8. The note does not provide for prepayment by the obligors and does contain an acceleration clause.

9. Albee performed all of its obligations under the contract of April 18, 1962.

10. Defendant is holder in due course of plaintiffs' obligation under the contract and the note.

11. Plaintiffs performed according to the tenor of their obligations through July of 1963, after having received proper notice of the assignment of the note, mortgage and bond and adequate notice of the total indebtedness, by making 14 monthly payments of $90 each to defendant corporation. These payments were made without protest and with notice that a total of $11,790 was due.

12. Plaintiffs have not made any regular payments since July, 1963.

## DISCUSSION

After due consideration of the briefs and contentions of the parties, we believe there can be no doubt that Pennsylvania law controls the issues in this case. Authorities cited to the court by defendant in support of the proposition that Ohio law governs are not in point. The contract was entered into in Pennsylvania

---

* The figures 60 and 90 were written in by hand, admittedly prior to plaintiffs' signing.

between Pennsylvania residents. It was secured by real property situated in Pennsylvania, and the mortgagors had no notice that they would be dealing with an Ohio corporation until approximately two months after entering into the contract. The sole exception to this proposition appears in defendant's exhibit "B", where there appears "Payable at Approved BANCredit Corp." Defendant contends this item alone is notice, and implies notice to plaintiffs that payment is due in Ohio and the transaction is governed by Ohio law. With this we cannot agree. Since plaintiff mortgagors' contract was made with Albee, it could hardly be assumed that plaintiffs expected or intended the law of any other state to govern the performance of their contract. Defendant, as Albee's assignee, is likewise bound by the law of the contract, that is, Pennsylvania law.

The economics of time purchase plans have traditionally been shrouded in arcane formulae. The transaction under review is no exception. As the finder of fact, we have concluded that plaintiff did not know in concrete terms how much the interest would be, although subsequent to April 18, 1962, this information was given and no protest made. Mr. Douglas Davies, office manager of defendant corporation, testified as to the method used to arrive at a "payoff" figure:

"A. We operate under the rule known as the Rule of Seventy-eight, Sum of the Digits Method.

". . .

"A. The book that we use in order to compute the refund of the unearned charges is the American Dollar Book of Dollar Refunds, and this is published by the American Charts Company, Atlanta, Georgia, and also accepted by the American Bankers Association.

"Q. The charts set forth in the booklet which you have in front of you, are they used to determine the amount which would be required to pay off a note at any given time?

"A. Yes. The chart is in here.

"Q. Let's see if we can correlate these; for example, take Exhibit 4, which is a letter dated July 25, 1962, and illustrate how this would work in against the book.

"A. First of all, we would have to know the number of months that the contract has been in force.

"Q. Assume that the note was dated May 9, 1962.

"A. Hypothetically we will state here that the loan has been open for a period of six months and the amount of the charges as specified in this particular loan were $2,790, for the period of five years. On the chart is indicated the number of months and the amount of dollars. We would go to the number of months as shown on the chart that were used and we would look for the dollar amount. On $2,700 for seven months the refund would be $2,111.32.

"Q. In other words, if there were a finance charge on this entire transaction of $2,790, and the customer proposed to pay it off, and that charge had been determined in the expectation that the payments might be spread over a period of five years, and the customer proposed to pay it off after it had been in effect for only six months, you would give the customer a credit against the time charges of $2,790, a credit in the amount of $2,111.32?

"A. That is correct, for $2,700.

"Q. So you would deduct that from the amount of the face of the note, deduct the amount of the payments that had been made?

"A. That is correct.

"Q. And that would determine the balance due?

"A. Plus acquisition cost".

Out of the testimony, the only thing that is clear is that defendant did not make clear how the interest is computed; nor at what rate. This is probably known only to the American Charts Company and the American Bankers Association. Lacking a lucid explanation of the payment plan from the one witness who might

have supplied it, the court must try to discover for itself how defendant computed interest and allocated plaintiffs' payments.

It is true that $2,790 is approximately equivalent to 6.2 percent of $9,000 for five years. This statement does not present a true picture, however, because that figure is correct only on a non-reduction basis; that is, on the total principal unreduced by payments. In theory, the debtor is paying on the principal with each installment so that his debt is diminishing. This means that the rate of interest, remaining fixed at 6.2 percent of $9,000, advances as the principal debt decreases.

It is interesting to note, too, Office Manager Davies' testimony that after 14 payments on a $9,000 debt, the "payoff" figure would be $8,921.91 or $8,891.91. (R. 56). Subtracting these figures from $9,000, one would find that $78 or $108 of the $1,260 in payments would be applied to principal, and $1,182 or $1,152 to interest. In either case, one must conclude that defendant would have collected approximately 42 percent of the total charges of $2,790 in only 14 months. Fifty-eight percent would have remained to be spread over the final 46 months of the installment purchase plan. It is obvious that either the defendant used some kind of sliding scale of interest or that its rate of simple interest was considerably higher than the 6.2 percent which it admitted charging.

More and more, the consensus grows that, although lenders who finance installment purchases and other types of credit sales are entitled to a higher return or a higher rate of interest than institutions making a straight loan, because of higher costs and greater risks involved in this type of transaction, the consumer has the right to know exactly what that rate of interest or related costs will be and the total gross figure which he will actually pay. The person who buys goods on the installment plan is most often the person who has no

alternative. Very often, he is swayed by promises of "low interest", or he has not the foresight or the courage to exact a hard figure from the seller. He seldom has the means to fight, and his grounds for resisting are limited under the law today.

There are no statutes regulating retail installment sales in the Commonwealth. The enactment by the legislature of the Home Improvement Finance Act of August 14, 1963, P. L. 1082, 73 PS §500-101 et seq., the Consumer Discount Company Act of April 8, 1937, P. L. 262, 7 PS §761-1, et seq., and the Motor Vehicle Sales Finance Act of June 28, 1947, P. L. 110, 69 PS §601 et seq., makes it conclusive that the regulation of financing practices is the province of the legislature and not the courts. Their failure to legislate in the field of retail installment sales means that the common law of Pennsylvania controls. That law is found in Langille v. Central-Penn National Bank of Philadelphia, 156 A. 2d 410 (1955). Other Pennsylvania cases are in harmony with this interpretation of Pennsylvania law: Equitable Credit and Discount Company v. Geier, 342 Pa. 445, 21 A. 2d 53 (1941); Melnicoff v. Huber Investment Company, 12 D. & C. 405, M. C. Phila. 1929.

The facts in Langille were almost identical to those here. The only important variation was that the seller of the shell (Barco) had a prearranged financing agreement with defendant bank to take all of Barco's time paper. Plaintiffs there argued that the prearrangement turned the installment purchase into a disguised loan which ought to be subject to the usury laws. The parties agreed that the transaction was governed by Pennsylvania law. The Delaware Supreme Court held at page 412:

"The decisive point here is that the so-called loan by Barco was made as a part of a sale of goods on a deferred payment plan, and that the primary and basic purpose of the transaction was the purchase of goods.

Such a sale under the Pennsylvania decisions is not in our opinion subject to the usury laws. We do not think that the pre-existing commitment of Barco to take the assignments of Washington's contract affects the matter. The Langilles seem to concede that if Washington had first executed the contract and later sold it to Barco, the transaction would have been lawful. We cannot think that the pre-arranging of the financing makes the transaction usurious. [Citing cases.] It is common knowledge that there exists a widespread practice of selling goods on deferred payments and of assigning the sales contracts to companies making a business of buying them and supplying the funds to finance them. . ."

Understanding what the law is, it becomes apparent that it is immaterial that we have concluded above that defendant is charging more interest than 6.2 percent as it claimed. The next question is whether, this being in the nature of an equitable proceeding, defendant has dealt so unfairly with plaintiffs that relief must be granted them from their unconscionable burden.

We find there is nothing in the dealings between the parties which is indicative of such gross injustice as would demand relief for plaintiffs. Parties may always make their own contracts. It is true that Albee's and defendant's failure to disclose the rate and exact amount of interest being charged is not entirely consonant with fair dealing. On the other hand, where time purchases are concerned, there are no legal restrictions on the interest rate, and the actual rate charged plaintiffs was less than 12 percent.

Plaintiffs do not allege fraud. Even if they did, a statement that "it will be very little interest" is not a misrepresentation of a material, presently existing fact that would support the allegation. It is too vague for any reasonable person to rely upon in good faith.

Neither did the Psomases allege that Albee *prevented*

them from reading the documents. Plaintiffs are not unintelligent nor unschooled. It is common knowledge that to sign papers in blank or unread is to court financial responsibility. Therefore, it is not unreasonable to fault plaintiffs for their failure to read documents before signing and for signing them in blank. Thus, there being no essential fraud in the original transaction, defendant holder in due course is not precluded from enforcing the note either at law or in equity: Uniform Commercial Code of April 6, 1953, P. L. 3, sec. 3-305, as amended.

The question remains whether the tender of $8,655 in August 1963 by plaintiffs' counsel to defendant was good so as to relieve plaintiffs of all further interest payments. The answer must be in the negative. In its letter of July 29, 1963, defendant gave its "payoff" figure as $8,967.04, approximately $300 more than plaintiffs tendered. The law in Pennsylvania is clear that tender of part of an entire demand is ineffective to satisfy the debt or stop interest from running: McKibbin v. Peters, 185 Pa. 518, 40 A. 288 (1898); Milligan v. Marshall, 38 Pa. Superior Ct. 60 (1909).

To avoid further payments, plaintiffs should have tendered the amount demanded by defendant, after which they could have sued for recovery of payments in excess of the legal interest rate of six percent within six months of payment, as provided in the Act of May 28, 1858, P. L. 622, sec. 2, 41 PS §4.

Defendant did not have to allow the payment of the debt before maturity; plaintiffs did not have the right to pay a lesser sum in advance of the maturity date. They cannot compute the amount owing according to their own scheme and then require their creditor to accept that computation.

### CONCLUSIONS OF LAW

1. The court has jurisdiction of these proceedings and of the parties.

2. The purchase order of April 18, 1962, was an installment purchase contract for the sale of goods. It was not a loan and is not subject to the restrictions of the Act of May 28, 1858, P. L. 622, as amended, 41 PS §3 et seq.

3. It cannot be said that the cost of goods on credit transaction is usurious, even though the percentage added is greater than the legal amount of interest on a loan.

4. Albee was authorized to complete the instruments in accordance with the agreement of the parties. Whether the papers were correctly filled in is moot, however, where, as here, the instrument is in the hands of a holder in due course and there is no fraud in the creation of the instrument.

5. If it were necessary to find whether the acknowledgment of plaintiffs' mortgage were an unauthorized addition, there is not sufficient clear and convincing evidence to support such a finding. In any case, such a finding is unnecessary, because the validity of the mortgage is not involved in these proceedings.

6. The law of Pennsylvania controls the obligations of the parties, including the rate of interest, even though defendant is an Ohio corporation.

7. The arrangement between defendant and Albee is standard merchandising practice and is not a device to confute the usury laws.

8. Plaintiffs have been in default since August 1963.

9. The offers of payment made by or on behalf of plaintiffs in August 1963 and December 1963, being tenders of less than the amount due on the note, were ineffective as tender.

10. The total obligation has become due and owing under the acceleration clause in the purchase order of April 18, 1962, by reason of plaintiff's default. The total sum of $11,790, less $1,260 already paid by plaintiffs, or $10,530, out of the $10,550 on deposit with

64

the prothonotary of this court must be paid over to defendant corporation.

11. The parties shall bear their own costs.

### DECREE NISI

And now, to wit, February 9, 1965, upon the above findings, discussion and conclusions of law, it is hereby ordered, adjudged and decreed that out of the fund of $10,550 paid into this court by plaintiffs and held by the Prothonotary of Allegheny County, pursuant to the Act of April 3, 1851, P. L. 868, 21 PS §684, $10,530 shall be distributed to defendant, Approved Bancredit Corporation, and the balance of $20 be returned to plaintiffs, Charles Psomas and Mary Jane Psomas, his wife. Eo die, exception noted and bill sealed.